# TAYLOR *v.* LOUISIANA

No. 73–5744.  Argued October 16, 1974—Decided January 21, 1975

WHITE, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, STEWART, MARSHALL, BLACKMUN, and POWELL, JJ., joined. BURGER, C. J., concurred in the result. REHNQUIST, J., filed a dissenting opinion, *post,* p. 538.

*William McM. King* argued the cause and filed a brief for appellant.

*Kendall L. Vick,* Assistant Attorney General of Louisiana, argued the cause for appellee. On the brief were *William J. Guste, Jr.,* Attorney General, *Walter Smith,* and *Woodrow W. Erwin.*

MR. JUSTICE WHITE delivered the opinion of the Court.

When this case was tried, Art. VII, § 41,[1] of the Louisiana Constitution, and Art. 402 of the Louisiana Code of Criminal Procedure[2] provided that a woman should not be selected for jury service unless she had previously filed a written declaration of her desire to be subject to jury service. The constitutionality of these provisions is the issue in this case.

---

[1] La. Const., Art. VII, § 41, read, in pertinent part:

"The Legislature shall provide for the election and drawing of competent and intelligent jurors for the trial of civil and criminal cases; provided, however, that no woman shall be drawn for jury service unless she shall have previously filed with the clerk of the District Court a written declaration of her desire to be subject to such service."

As of January 1, 1975, this provision of the Louisiana Constitution was repealed and replaced by the following provision, La. Const., Art. V, § 33:

"(A) Qualifications.

"A citizen of the state who has reached the age of majority is eligible to serve as a juror within the parish in which he is domiciled. The legislature may provide additional qualifications.

"(B) Exemptions.

"The supreme court shall provide by rule for exemption of jurors."

[2] La. Code Crim. Proc., Art. 402, provided:

"A woman shall not be selected for jury service unless she has previously filed with the clerk of court of the parish in which she resides a written declaration of her desire to be subject to jury service."

This provision has been repealed, effective January 1, 1975. The repeal, however, has no effect on the conviction obtained in this case.

I

Appellant, Billy J. Taylor, was indicted by the grand jury of St. Tammany Parish, in the Twenty-second Judicial District of Louisiana, for aggravated kidnaping. On April 12, 1972, appellant moved the trial court to quash the petit jury venire drawn for the special criminal term beginning with his trial the following day. Appellant alleged that women were systematically excluded from the venire and that he would therefore be deprived of what he claimed to be his federal constitutional right to "a fair trial by jury of a representative segment of the community . . . ."

The Twenty-second Judicial District comprises the parishes of St. Tammany and Washington. The appellee has stipulated that 53% of the persons eligible for jury service in these parishes were female, and that no more than 10% of the persons on the jury wheel in St. Tammany Parish were women.[3] During the period from December 8, 1971, to November 3, 1972, 12 females were among the 1,800 persons drawn to fill petit jury venires in St. Tammany Parish. It was also stipulated that the discrepancy between females eligible for jury service and those actually included in the venire was the result of the operation of La. Const., Art. VII, § 41, and La. Code Crim. Proc., Art. 402.[4] In the present case, a venire totaling 175 persons was drawn for jury service beginning April 13, 1972. There were no females on the venire.

Appellant's motion to quash the venire was denied that same day. After being tried, convicted, and sentenced to death, appellant sought review in the Supreme Court of Louisiana, where he renewed his claim that the

---

[3] The stipulation appears in the Appendix, at 82–84, filed in *Edwards* v. *Healy*, No. 73–759, now pending before the Court.

[4] *Ibid.*

petit jury venire should have been quashed. The Supreme Court of Louisiana, recognizing that this claim drew into question the constitutionality of the provisions of the Louisiana Constitution and Code of Criminal Procedure dealing with the service of women on juries, squarely held, one justice dissenting, that these provisions were valid and not unconstitutional under federal law. 282 So. 2d 491, 497 (1973).[5]

Appellant appealed from that decision to this Court. We noted probable jurisdiction, 415 U. S. 911 (1974), to consider whether the Louisiana jury-selection system deprived appellant of his Sixth and Fourteenth Amendment right to an impartial jury trial. We hold that it did and that these Amendments were violated in this case by the operation of La. Const., Art. VII, § 41, and La. Code Crim. Proc., Art. 402. In consequence, appellant's conviction must be reversed.

## II

The Louisiana jury-selection system does not disqualify women from jury service, but in operation its conceded systematic impact is that only a very few women, grossly disproportionate to the number of eligible women in the community, are called for jury service. In this case, no women were on the venire from which the petit jury was drawn. The issue we have, therefore, is whether a jury-selection system which operates to exclude from jury service an identifiable class of citizens constituting 53%

---

[5] The death sentence imposed on appellant was annulled and set aside by the Supreme Court of Louisiana in accord with this Court's decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972), with instructions to the District Court to impose a life sentence on remand. The Supreme Court of Louisiana granted a rehearing to appellant on certain other issues not relevant to this appeal, 282 So. 2d 491, 500 (1973), and later denied a second petition for rehearing.

of eligible jurors in the community comports with the Sixth and Fourteenth Amendments.

The State first insists that Taylor, a male, has no standing to object to the exclusion of women from his jury. But Taylor's claim is that he was constitutionally entitled to a jury drawn from a venire constituting a fair cross section of the community and that the jury that tried him was not such a jury by reason of the exclusion of women. Taylor was not a member of the excluded class; but there is no rule that claims such as Taylor presents may be made only by those defendants who are members of the group excluded from jury service. In *Peters* v. *Kiff*, 407 U. S. 493 (1972), the defendant, a white man, challenged his conviction on the ground that Negroes had been systematically excluded from jury service. Six Members of the Court agreed that petitioner was entitled to present the issue and concluded that he had been deprived of his federal rights. Taylor, in the case before us, was similarly entitled to tender and have adjudicated the claim that the exclusion of women from jury service deprived him of the kind of factfinder to which he was constitutionally entitled.

### III

The background against which this case must be decided includes our holding in *Duncan* v. *Louisiana*, 391 U. S. 145 (1968), that the Sixth Amendment's provision for jury trial is made binding on the States by virtue of the Fourteenth Amendment. Our inquiry is whether the presence of a fair cross section of the community on venires, panels, or lists from which petit juries are drawn is essential to the fulfillment of the Sixth Amendment's guarantee of an impartial jury trial in criminal prosecutions.

The Court's prior cases are instructive. Both in the

course of exercising its supervisory powers over trials in federal courts and in the constitutional context, the Court has unambiguously declared that the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community. A unanimous Court stated in *Smith* v. *Texas*, 311 U. S. 128, 130 (1940), that "[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." To exclude racial groups from jury service was said to be "at war with our basic concepts of a democratic society and a representative government." A state jury system that resulted in systematic exclusion of Negroes as jurors was therefore held to violate the Equal Protection Clause of the Fourteenth Amendment. *Glasser* v. *United States*, 315 U. S. 60, 85–86 (1942), in the context of a federal criminal case and the Sixth Amendment's jury trial requirement, stated that "[o]ur notions of what a proper jury is have developed in harmony with our basic concepts of a democratic society and a representative government," and repeated the Court's understanding that the jury " 'be a body truly representative of the community' . . . and not the organ of any special group or class."

A federal conviction by a jury from which women had been excluded, although eligible for service under state law, was reviewed in *Ballard* v. *United States*, 329 U. S. 187 (1946). Noting the federal statutory "design to make the jury 'a cross-section of the community' " and the fact that women had been excluded, the Court exercised its supervisory powers over the federal courts and reversed the conviction. In *Brown* v. *Allen*, 344 U. S. 443, 474 (1953), the Court declared that "[o]ur duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source

reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty."

Some years later in *Carter* v. *Jury Comm'n,* 396 U. S. 320, 330 (1970), the Court observed that the exclusion of Negroes from jury service because of their race "contravenes the very idea of a jury—'a body truly representative of the community' . . . ." (Quoting from *Smith* v. *Texas, supra.*) At about the same time it was contended that the use of six-man juries in noncapital criminal cases violated the Sixth Amendment for failure to provide juries drawn from a cross section of the community, *Williams* v. *Florida,* 399 U. S. 78 (1970). In the course of rejecting that challenge, we said that the number of persons on the jury should "be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community." *Id.,* at 100. In like vein, in *Apodaca* v. *Oregon,* 406 U. S. 404, 410–411 (1972) (plurality opinion), it was said that "a jury will come to such a [commonsense] judgment as long as it consists of a group of laymen representative of a cross section of the community who have the duty and the opportunity to deliberate . . . on the question of a defendant's guilt." Similarly, three Justices in *Peters* v. *Kiff,* 407 U. S., at 500, observed that the Sixth Amendment comprehended a fair possibility for obtaining a jury constituting a representative cross section of the community.

The unmistakable import of this Court's opinions, at least since 1940, *Smith* v. *Texas, supra,* and not repudiated by intervening decisions, is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial. Recent federal legislation governing jury selection within the federal court system has a similar thrust. Shortly prior to this Court's decision

in *Duncan* v. *Louisiana, supra,* the Federal Jury Selection and Service Act of 1968 [6] was enacted. In that Act, Congress stated "the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U. S. C. § 1861. In that Act, Congress also established the machinery by which the stated policy was to be implemented. 28 U. S. C. §§ 1862–1866. In passing this legislation, the Committee Reports of both the House [7] and the Senate [8] recognized that the jury plays a political function in the administration of the law and

---

[6] Pub. L. 90–274, 82 Stat. 53, 28 U. S. C. § 1861 *et seq.*

[7] H. R. Rep. No. 1076, 90th Cong., 2d Sess., 8 (1968):

"It must be remembered that the jury is designed not only to understand the case, but also to reflect the community's sense of justice in deciding it. As long as there are significant departures from the cross sectional goal, biased juries are the result—biased in the sense that they reflect a slanted view of the community they are supposed to represent."

See S. Rep. No. 92–516, p. 3 (1971).

[8] S. Rep. No. 891, 90th Cong., 1st Sess., 9 (1967): "A jury chosen from a representative community sample is a fundamental of our system of justice."

Both the Senate and House Reports made reference to the decision of the Court of Appeals in *Rabinowitz* v. *United States,* 366 F. 2d 34, 57 (CA5 1966), which, in sustaining an attack on the composition of grand and petit jury venires in the Middle District of Georgia, had held that both the Constitution and 28 U. S. C. § 1861, prior to its amendment in 1968, required a system of jury selection "that will probably result in a fair cross-section of the community being placed on the jury rolls." See S. Rep. No. 891, *supra,* at 11, 18; H. R. Rep. No. 1076, *supra,* n. 7, at 4, 5.

Elimination of the "key man" system throughout the federal courts was the primary focus of the Federal Jury Selection and Service Act of 1968. See H. R. Rep. No. 1076, *supra,* at 4 and n. 1.

that the requirement of a jury's being chosen from a fair cross section of the community is fundamental to the American system of justice. Debate on the floors of the House and Senate on the Act invoked the Sixth Amendment,[9] the Constitution generally,[10] and prior decisions of this Court [11] in support of the Act.

We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has solid foundation. The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps over-conditioned or biased response of a judge. *Duncan* v. *Louisiana,* 391 U. S., at 155–156. This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. "Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case. . . . [T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly

---

[9] 114 Cong. Rec. 3992 (1968) (remarks of Mr. Rogers). See also 118 Cong. Rec. 6939 (1972) (remarks of Mr. Poff).

[10] 114 Cong. Rec. 3999 (1968) (remarks of Mr. Machen).

[11] *Id.,* at 6609 (remarks of Sen. Tydings).

because sharing in the administration of justice is a phase of civic responsibility." *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217, 227 (1946) (Frankfurter, J., dissenting).

## IV

We are also persuaded that the fair-cross-section requirement is violated by the systematic exclusion of women, who in the judicial district involved here amounted to 53% of the citizens eligible for jury service. This conclusion necessarily entails the judgment that women are sufficiently numerous and distinct from men and that if they are systematically eliminated from jury panels, the Sixth Amendment's fair-cross-section requirement cannot be satisfied. This very matter was debated in *Ballard* v. *United States, supra.* Positing the fair-cross-section rule—there said to be a statutory one—the Court concluded that the systematic exclusion of women was unacceptable. The dissenting view that an all-male panel drawn from various groups in the community would be as truly representative as if women were included, was firmly rejected:

> "The thought is that the factors which tend to influence the action of women are the same as those which influence the action of men—personality, background, economic status—and not sex. Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act as a class. But, if the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel? The truth is that the two sexes are not fungible; a community made up exclusively of one is different from a community composed of both; the subtle interplay of influence one on the other is

532

among the imponderables. To insulate the court-room from either may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded. The exclusion of one may indeed make the jury less representative of the community than would be true if an economic or racial group were excluded." 329 U. S., at 193–194.[12]

---

[12] Compare *Peters* v. *Kiff*, 407 U. S. 493, 502–504 (1972) (opinion of MARSHALL, J., joined by DOUGLAS and STEWART, JJ.):

"These principles compel the conclusion that a State cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States. Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well.

.        .        .        .        .

"But the exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases. . . .

"Moreover, we are unwilling to make the assumption that the exclusion of Negroes has relevance only for issues involving race. When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." (Footnote omitted.) Controlled studies of the performance of women as jurors conducted subsequent to the Court's decision in *Ballard* have concluded that women bring to juries their own perspectives and values that influence both jury deliberation and result. See generally Rudolph, Women on Juries—Voluntary or Compulsory?, 44 J. Am. Jud. Soc. 206 (1961); 55 J. Sociology & Social Research 442 (1971); 3 J. Applied Social Psychology 267 (1973); 19 Sociometry 3 (1956).

In this respect, we agree with the Court in *Ballard:* If the fair-cross-section rule is to govern the selection of juries, as we have concluded it must, women cannot be systematically excluded from jury panels from which petit juries are drawn. This conclusion is consistent with the current judgment of the country, now evidenced by legislative or constitutional provisions in every State and at the federal level qualifying women for jury service.[13]

## V

There remains the argument that women as a class serve a distinctive role in society and that jury service would so substantially interfere with that function that the State has ample justification for excluding women from service unless they volunteer, even though the result is that almost all jurors are men. It is true that *Hoyt* v. *Florida,* 368 U. S. 57 (1961), held that such a system [14] did not deny due process of law or equal pro-

---

[13] This is a relatively modern development. Under the English common law, women, with the exception of the trial of a narrow class of cases, were not considered to be qualified for jury service by virtue of the doctrine of *propter defectum sexus,* a "defect of sex." 3 W. Blackstone, Commentaries *362. This common-law rule was made statutory by Parliament in 1870, 33 & 34 Vict., c. 77, and then rejected by Parliament in 1919, 9 & 10 Geo. 5, c. 71. In this country women were disqualified by state law to sit as jurors until the end of the 19th century. They were first deemed qualified for jury service by a State in 1898, Utah Rev. Stat. Ann., Tit. 35, § 1297 (1898). Today, women are qualified as jurors in all the States. The jury-service statutes and rules of most States do not on their face extend to women the type of exemption presently before the Court, although the exemption provisions of some States do appear to treat men and women differently in certain respects.

[14] Florida Stat. 1959, § 40.01 (1), provided that grand and petit jurors be taken from male and female citizens of the State possessed of certain qualifications and also provided that "the name of no female person shall be taken for jury service unless said person has registered

tection of the laws because there was a sufficiently rational basis for such an exemption.[15] But *Hoyt* did not involve a defendant's Sixth Amendment right to a jury drawn from a fair cross section of the community and the prospect of depriving him of that right if women as a class are systematically excluded. The right to a proper jury cannot be overcome on merely rational grounds.[16] There must be weightier reasons if a distinctive class representing 53% of the eligible jurors is for all practical purposes to be excluded from jury service. No such basis has been tendered here.

The States are free to grant exemptions from jury service to individuals in case of special hardship or incapacity and to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare. *Rawlins* v. *Georgia,* 201 U. S. 638 (1906). It would not appear that such exemptions would pose substantial threats that the remaining pool of jurors would not be representative of the community. A system excluding all women, however, is a wholly different matter. It is untenable to suggest these days that it would be a special hardship for each and every woman to perform jury service or that society cannot

---

with the clerk of the circuit court her desire to be placed on the jury list." *Hoyt* v. *Florida,* 368 U. S. 57, 58 (1961).

[15] The state interest, as articulated by the Court, was based on the assumption that "woman is still regarded as the center of home and family life." *Hoyt* v. *Florida, supra,* at 62. Louisiana makes a similar argument here, stating that its grant of an automatic exemption from jury service to females involves only the State's attempt "to regulate and provide stability to the state's own idea of family life." Brief for Appellee 12.

[16] In *Hoyt,* the Court determined both that the underlying classification was rational and that the State's proffered rationale for extending this exemption to females without family responsibilities was justified by administrative convenience. 368 U. S., at 62–63.

spare *any* women from their present duties.[17]   This may be the case with many, and it may be burdensome to sort out those who should be exempted from those who should serve.   But that task is performed in the case of men, and the administrative convenience in dealing with women as a class is insufficient justification for diluting the quality of community judgment represented by the jury in criminal trials.

## VI

Although this judgment may appear a foregone conclusion from the pattern of some of the Court's cases over the past 30 years, as well as from legislative developments at both federal and state levels, it is nevertheless true that until today no case had squarely held that the exclusion of women from jury venires deprives a criminal

---

[17] In *Hoyt* v. *Florida, supra,* the Court placed some emphasis on the notion, advanced by the State there and by Louisiana here in support of the rationality of its statutory scheme, that "woman is still regarded as the center of home and family life."   368 U. S., at 62.   Statistics compiled by the Department of Labor indicate that in October 1974, 54.2% of all women between 18 and 64 years of age were in the labor force.   United States Dept. of Labor, Women in the Labor Force (Oct. 1974).   Additionally, in March 1974, 45.7% of women with children under the age of 18 were in the labor force; with respect to families containing children between the ages of six and 17, 67.3% of mothers who were widowed, divorced, or separated were in the work force, while 51.2% of the mothers whose husbands were present in the household were in the work force.   Even in family units in which the husband was present and which contained a child under three years old, 31% of the mothers were in the work force.   United States Dept. of Labor, Marital and Family Characteristics of the Labor Force, Table F (March 1974).   While these statistics perhaps speak more to the evolving nature of the structure of the family unit in American society than to the nature of the role played by women who happen to be members of a family unit, they certainly put to rest the suggestion that all women should be exempt from jury service based solely on their sex and the presumed role in the home.

defendant of his Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community. It is apparent that the first Congress did not perceive the Sixth Amendment as requiring women on criminal jury panels; for the direction of the First Judiciary Act of 1789 was that federal jurors were to have the qualifications required by the States in which the federal court was sitting [18] and at the time women were disqualified under state law in every State. Necessarily, then, federal juries in criminal cases were all male, and it was not until the Civil Rights Act of 1957, 71 Stat. 638, 28 U. S. C. § 1861 (1964 ed.), that Congress itself provided that all citizens, with limited exceptions, were competent to sit on federal juries. Until that time, federal courts were required by statute to exclude women from jury duty in those States where women were disqualified. Utah was the first State to qualify women for juries; it did so in 1898, n. 13, *supra*. Moreover, *Hoyt* v. *Florida* was decided and has stood for the proposition that, even if women as a group could not be constitutionally disqualified from jury service, there was ample reason to treat all women differently from men for the purpose of jury service and to exclude them unless they volunteered.[19]

---

[18] Section 29 of that Act provided that "the jurors shall have the same qualifications as are requisite for jurors by the laws of the State of which they are citizens, to serve in the highest courts of law of such State . . . ." 1 Stat. 88.

[19] *Hoyt* v. *Florida*, as had *Fay* v. *New York*, 332 U. S. 261, 289–290 (1947), also referred to the historic view that jury service could constitutionally be confined to males: "We need not, however, accept appellant's invitation to canvass in this case the continuing validity of this Court's dictum in *Strauder* v. *West Virginia*, 100 U. S. 303, 310, to the effect that a State may constitutionally 'confine' jury duty 'to males.' This constitutional proposition has gone unquestioned for more than eighty years in the decisions of the Court, see *Fay* v. *New York*, *supra*, at 289–290, and had been reflected, until 1957, in congressional policy respecting jury service in the federal

Accepting as we do, however, the view that the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community, we think it is no longer tenable to hold that women as a class may be excluded or given automatic exemptions based solely on sex if the consequence is that criminal jury venires are almost totally male. To this extent we cannot follow the contrary implications of the prior cases, including *Hoyt* v. *Florida*. If it was ever the case that women were unqualified to sit on juries or were so situated that none of them should be required to perform jury service, that time has long since passed. If at one time it could be held that Sixth Amendment juries must be drawn from a fair cross section of the community but that this requirement permitted the almost total exclusion of women, this is not the case today. Communities differ at different times and places. What is a fair cross section at one time or place is not necessarily a fair cross section at another time or a different place. Nothing persuasive has been presented to us in this case suggesting that all-male venires in the parishes involved here are fairly representative of the local population otherwise eligible for jury service.

## VII

Our holding does not augur or authorize the fashioning of detailed jury-selection codes by federal courts. The

---

courts themselves." 368 U. S., at 60. (Footnote omitted.) See also *Glasser* v. *United States*, 315 U. S. 60, 64–65, 85–86 (1942).

It is most interesting to note that *Strauder* v. *West Virginia* itself stated:

"[T]he constitution of juries is a very essential part of the protection such a mode of trial is intended to secure. The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." 100 U. S. 303, 308 (1880).

fair-cross-section principle must have much leeway in application. The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community. *Carter* v. *Jury Comm'n, supra,* as did *Brown* v. *Allen, supra; Rawlins* v. *Georgia, supra,* and other cases, recognized broad discretion in the States in this respect. We do not depart from the principles enunciated in *Carter.* But, as we have said, Louisiana's special exemption for women operates to exclude them from petit juries, which in our view is contrary to the command of the Sixth and Fourteenth Amendments.

It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, *Fay* v. *New York,* 332 U. S. 261, 284 (1947); *Apodaca* v. *Oregon,* 406 U. S., at 413 (plurality opinion); but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

The judgment of the Louisiana Supreme Court is reversed and the case remanded to that court for further proceedings not inconsistent with this opinion.

*So ordered.*

MR. CHIEF JUSTICE BURGER concurs in the result.

MR. JUSTICE REHNQUIST, dissenting.

The Court's opinion reverses a conviction without a suggestion, much less a showing, that the appellant has been unfairly treated or prejudiced in any way by the

manner in which his jury was selected. In so doing, the Court invalidates a jury-selection system which it approved by a substantial majority only 13 years ago. I disagree with the Court and would affirm the judgment of the Supreme Court of Louisiana.

The majority opinion canvasses various of our jury trial cases, beginning with *Smith* v. *Texas,* 311 U. S. 128 (1940). Relying on carefully chosen quotations, it concludes that the "unmistakable import" of our cases is that the fair-cross-section requirement "is an essential component of the Sixth Amendment right to a jury trial." I disagree. Fairly read, the only "unmistakable import" of those cases is that due process and equal protection prohibit jury-selection systems which are likely to result in biased or partial juries. *Smith* v. *Texas, supra,* concerned the equal protection claim of a Negro who was indicted by a grand jury from which Negroes had been systematically excluded. *Glasser* v. *United States,* 315 U. S. 60 (1942), dealt with allegations that the only women selected for jury service were members of a private organization which had conducted pro-prosecution classes for prospective jurors. *Brown* v. *Allen,* 344 U. S. 443 (1953), rejected the equal protection and due process contentions of several black defendants that members of their race had been discriminatorily excluded from their juries. *Carter* v. *Jury Comm'n,* 396 U. S. 320 (1970), similarly dealt with equal protection challenges to a jury-selection system, but the persons claiming such rights were blacks who had sought to serve as jurors.

In *Hoyt* v. *Florida,* 368 U. S. 57 (1961), this Court gave plenary consideration to contentions that a system such as Louisiana's deprived a defendant of equal protection and due process. These contentions were rejected, despite circumstances which were much more suggestive of possible bias and prejudice than are those here—the de-

fendant in *Hoyt* was a woman whose defense to charges of murdering her husband was that she had been driven temporarily insane by his suspected infidelity and by his rejection of her efforts at reconciliation. *Id.*, at 58–59. The complete swing of the judicial pendulum 13 years later must depend for its validity on the proposition that during those years things have changed in constitutionally significant ways. I am not persuaded of the sufficiency of either of the majority's proffered explanations as to intervening events.

The first determinative event, in the Court's view, is *Duncan* v. *Louisiana,* 391 U. S. 145 (1968). Because the Sixth Amendment was there held applicable to the States, the Court feels free to dismiss *Hoyt* as a case which dealt with entirely different issues—even though in fact it presented the identical problem. But *Duncan's* rationale is a good deal less expansive than is suggested by the Court's present interpretation of that case. *Duncan* rests on the following reasoning:

"The test for determining whether a right extended by the Fifth and Sixth Amendments with respect to federal criminal proceedings is also protected against state action by the Fourteenth Amendment has been phrased in a variety of ways in the opinions of this Court. The question has been asked whether a right is among those ' "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions," ' *Powell* v. *Alabama,* 287 U. S. 45, 67 (1932); whether it is 'basic in our system of jurisprudence,' *In re Oliver,* 333 U. S. 257, 273 (1948); and whether it is 'a fundamental right, essential to a fair trial,' *Gideon* v. *Wainwright,* 372 U. S. 335, 343–344 (1963); *Malloy* v. *Hogan,* 378 U. S. 1, 6 (1964); *Pointer* v. *Texas,* 380 U. S. 400, 403 (1965). . . . *Because we believe that trial by*

*jury in criminal cases is fundamental to the American scheme of justice,* we hold that the Fourteenth Amendment guarantees a right of jury trial in all criminal cases . . . ." *Id.,* at 148–149. (Emphasis added.)

That this is a sturdy test, one not readily satisfied by every discrepancy between federal and state practice, was made clear not only in *Williams* v. *Florida,* 399 U. S. 78 (1970), and *Apodaca* v. *Oregon,* 406 U. S. 404 (1972), but also in *Duncan* itself. In explaining the conclusion that a jury trial is fundamental to our scheme of justice, and therefore should be required of the States, the Court pointed out that jury trial was designed to be a defense "against arbitrary law enforcement," 391 U. S., at 156, and "to prevent oppression by the Government." *Id.,* at 155. The Court stated its belief that jury trial for serious offenses is "essential for preventing miscarriages of justice and for assuring that fair trials are provided for all defendants." *Id.,* at 158.

I cannot conceive that today's decision is necessary to guard against oppressive or arbitrary law enforcement, or to prevent miscarriages of justice and to assure fair trials. Especially is this so when the criminal defendant involved makes no claims of prejudice or bias. The Court does accord some slight attention to justifying its ruling in terms of the basis on which the right to jury trial was read into the Fourteenth Amendment. It concludes that the jury is not effective, as a prophylaxis against arbitrary prosecutorial and judicial power, if the "jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool." *Ante,* at 530. It fails, however, to provide any satisfactory explanation of the mechanism by which the Louisiana system undermines the prophylactic role of the jury, either in general or in this case. The best it can do is to

posit "'a flavor, a distinct quality,'" which allegedly is lost if either sex is excluded. *Ante,* at 532. However, this "flavor" is not of such importance that the Constitution is offended if any given petit jury is not so enriched. *Ante,* at 538. This smacks more of mysticism than of law. The Court does not even purport to practice its mysticism in a consistent fashion—presumably doctors, lawyers, and other groups, whose frequent exemption from jury service is endorsed by the majority, also offer qualities as distinct and important as those at issue here.

In *Hoyt,* this Court considered a stronger due process claim than is before it today, but found that fundamental fairness had not been offended. I do not understand how our intervening decision in *Duncan* can support a different result. After all, *Duncan* imported the Sixth Amendment into the Due Process Clause only because, and only to the extent that, this was perceived to be required by fundamental fairness.

The second change since *Hoyt* that appears to undergird the Court's turnabout is societal in nature, encompassing both our higher degree of sensitivity to distinctions based on sex, and the "evolving nature of the structure of the family unit in American society." *Ante,* at 535 n. 17. These are matters of degree, and it is perhaps of some significance that in 1961 Mr. Justice Harlan saw fit to refer to the "enlightened emancipation of women from the restrictions and protections of bygone years, and their entry into many parts of community life formerly considered to be reserved to men." *Hoyt,* 368 U. S., at 61–62. Nonetheless, it may be fair to conclude that the Louisiana system is in fact an anachronism, inappropriate at this "time or place." *Ante,* at 537. But surely constitutional adjudication is a more canalized function than enforcing as against the States this Court's perception of modern life.

Absent any suggestion that appellant's trial was unfairly conducted, or that its result was unreliable, I would not require Louisiana to retry him (assuming the State can once again produce its evidence and witnesses) in order to impose on him the sanctions which its laws provide.