**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Charles J. HAWKINS, Defendant-Appellant.**

No. 84–3594.

United States Court of Appeals, Eleventh Circuit.

Feb. 10, 1986.

John M. Robertson, Mark L. Horwitz, Orlando, Fla., for defendant-appellant.

Stephen J. Calvacca, Thomas W. Turner, Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and DYER, Senior Circuit Judge.

JOHNSON, Circuit Judge:

Defendant-appellant Charles J. Hawkins served as both President of Washington Shores Federal Savings and Loan Association ("WSF") and Treasurer of Washington Shores Association for Recreation ("WSAR"). WSAR was essentially a day care center, funded primarily through grants and private contributions, which served a large number of families in a black community in the Orlando, Florida, area. Appellant was Treasurer of WSAR from its inception in 1970 until its demise in 1981, responsible for handling several million dollars of funding. An IRS tax lien against WSAR ultimately forced its sale in 1982.

Appellant handled all of WSAR's financial transactions through accounts at WSF. Appellant issued strict orders that no other WSF employee was to handle WSAR deposits. No one other than appellant had any records of WSAR's income or expenditures. A reconstruction through subpoena of WSAR's income and legitimate business expenses for the period of May 1, 1978, through September 20, 1979, revealed that the sum of $179,531 was missing.

A federal grand jury returned two separate indictments against appellant. The

first indictment, No. 83–51, contained six counts and charged that appellant had embezzled funds and had filed false personal income tax returns. The second indictment, No. 83–54, contained 11 counts and charged that appellant, in his capacity as principal officer and sole financial comptroller of WSAR, was required to collect and pay over withholding taxes and willfully failed to do so.

The two cases were consolidated for trial before the United States District Court for the Middle District of Florida, Orlando Division. After a four-week trial involving nearly 50 government witnesses and several thousand pages of exhibits, on July 9, 1984, a jury convicted appellant of one count of embezzlement and three counts of filing false personal income tax returns in case No. 83–51; and of 11 counts of tax-evasion in case No. 83–54. The trial court sentenced appellant to five years incarceration on the embezzlement count, three years on the false personal income tax counts, and three years on six of the tax-evasion counts, all sentences to run concurrently. On the remaining five tax-evasion counts, the court sentenced appellant to five years probation to commence upon his release from custody. Appellant filed a timely notice of appeal.

## I. Ambiguity in Indictment

■ Appellant's first contention on appeal is that his convictions for failure to pay over withholding taxes should be reversed because those convictions were based on an ambiguous indictment. The indictment in case No. 83–54 alleged that the defendant "did wilfully and knowingly attempt to evade and defeat the *assessment and payment* of said withheld taxes" (emphasis added). Appellant contends that the indictment presented the grand jury with two theories of criminal conduct, when in fact only one of those theories was a crime. Appellant argues that it is impossible to tell whether the grand jury returned the indictment in No. 83–54 on the grounds that appellant attempted to evade and defeat the "assessment" of the tax, or on the grounds that he attempted to evade and defeat the "payment" of the tax. Appellant claims that, because attempting to evade and defeat the assessment of a tax is not a crime, appellant might have been indicted in No. 83–54 on the basis of non-criminal conduct. Appellant argues that his convictions based on that indictment should therefore be reversed. *See Standard Oil Company of Texas v. United States*, 307 F.2d 120, 130 (5th Cir.1962).

After the trial, appellant moved for a judgment of acquittal on the grounds that the indictment was ambiguous and may have been returned on the basis of non-criminal conduct. The trial court struck that portion of the indictment relating to the "assessment" of taxes as surplusage and denied appellant's motion.

Appellant's argument is incorrect because the indictment charged him with evading and defeating the assessment *and* payment of taxes, rather than with evading and defeating the assessment *or* payment of taxes. Because the language of the indictment was *conjunctive* rather than *disjunctive*, the indictment could not have been returned without a finding that appellant had engaged in the criminal conduct of evading and defeating the payment of taxes. Likewise, the convictions on the charges in No. 83–54 were necessarily based upon a finding that appellant had evaded and defeated the payment of taxes. The district court acted properly in striking the language relating to "assessment" as surplusage. Fed.R.Crim.P. 7(d), 52(a).

## II. Prosecution's Use of Peremptory Challenges

Appellant's second argument is that the racially motivated use of peremptory challenges to strike blacks from the jury deprived appellant, who is black, of a fair trial. The jury selection process in the present case took six days, during which time prospective jurors were subject to in-depth, protracted questioning. The government was entitled to use six peremptory challenges. Four prospective black jurors were on the jury venire. The government struck two of these peremptorily. The government successfully chal-

lenged a third prospective black juror for cause. The fourth prospective black juror was chosen to serve on the jury.

The two prospective black jurors who were struck peremptorily were Ms. Stella Studstill and Mr. Sanford Adams. In response to questioning on voir dire, Ms. Studstill said she was nervous, especially about making the "wrong decision" on the issue of guilt or innocence, and that she would prefer not to sit on the case. Mr. Adams was a middle aged man of approximately the same age as appellant, and like appellant was divorced. He worked for Pan American Airlines for 28 years as a manual laborer. He did not prepare his own tax return, nor did he employ an accountant. He would allow the IRS to determine his taxes each year, and then he would return the tax form to the Service Center. During the jury selection process, appellant objected to the use of peremptory strikes against each of these two prospective jurors on the grounds that the strikes were racially motivated.

The black juror who was struck for cause was Mr. Wilken Scott. Mr. Scott testified on voir dire that he had met appellant on several occasions at the bank. He stated that his contact with appellant was limited to stating pleasantries such as "hello," and that he had not seen appellant for about eight months. Mr. Scott said that he had seen media coverage of the case but that he could decide the case on the evidence alone. Another prospective juror, Mr. James Graham, testified that Mr. Scott had expressed the opinion to him that appellant was guilty. Mr. Scott then denied discussing the case with Mr. Graham and denied expressing any opinion about appellant's guilt.

The prosecutor moved to dismiss Mr. Scott for cause because he had expressed a premature opinion of guilt. The prosecutor said he had a "gut feeling" that Mr. Scott was not telling the truth, because Mr. Graham would have "no reason to wrongly attribute a remark to the juror." Appellant objected that the government had no standing to strike a juror for cause because the juror had expressed an opinion favorable to the government and unfavorable to the defendant, and requested that if Mr. Scott was to be stricken for cause, Mr. Graham should be as well. Appellant claimed that removing Mr. Scott was part of the systematic removal of blacks from the panel. The court granted the prosecutor's motion to strike Mr. Scott for cause.

The fourth prospective black juror was Ms. Laura Porter. She stated that she was the founder of an organization dedicated to making a better life for underprivileged youths. She was chosen to serve on the jury.

In addition to using two peremptory challenges to remove prospective black jurors, the government used three other peremptory challenges to remove prospective white jurors. After the jury was chosen, the government had one peremptory challenge remaining.

At the time of appellant's objection to the challenge of Mr. Scott for cause, the prosecutor, Mr. Calvacca, articulated his reasons for that challenge and for the use of his prior peremptory strikes. He said:

> With respect to all of the challenges that I've exercised with respect to black jurors, let me say this. We did not challenge Laura Porter. She's a black woman, and the reason the Government did not challenge her for any reason was, number one, there was no basis in cause. Number two, from a strategic point of view, I thought she had the life experience, I thought she had the intellectual depth, and I thought she had the character and integrity that would make her an excellent juror for both sides in this case.
>
> We challenged Mrs. Studstill, who was the young lady picked on the panel several days ago, because Mrs. Studstill indicated that she was nervous about making an important decision and she was nervous about making the wrong decision with respect to guilt or innocence.
>
> I would have exercised the challenge as to any juror, black and white, who would exhibit that type of nervousness with regard to the discharge of their duties.

And, finally, we had challenged Mr. Sanford Adams. Mr. Adams, because of his life experience, his position, would not be a suitable juror on a complex white collar case and we've exercised that challenge for the same grounds with respect to other white jurors. I don't think there is any racial motivation behind the Government's exercising its peremptory.

And, finally, with respect to the most current juror, Mr. Scott, I'm not comfortable with any juror who claims to know the Defendant and then indicates at the same time he or she will have no difficulty bringing back a guilty verdict against someone that he or she knows, especially when there's nothing in that relationship to be unfavorable.

This latest quirk in his particular position is an interesting one, but it just means he's probably unfair to both sides for different means, and I don't think it cuts away from the Government's right to challenge for both of those reasons. We're not looking to challenge only people who are anti-Defendant, but people who, on appeal, would be difficult to sustain. The Government is trying this case with a view toward avoiding any possibility of reversal; and so, I object to the reference of racism on the part of the Government, and I renew my challenge for cause with respect to Mr. Scott.

The Supreme Court addressed the problem of the use of peremptory strikes to achieve an all-white jury in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In *Swain*, an all-white jury convicted a black man of raping a white woman and sentenced him to death. The defendant raised a timely challenge to the composition of the petit jury, primarily on the grounds that, through the use of peremptory strikes, the prosecutor removed six blacks from the petit jury venire. *Id.* at 210, 85 S.Ct. at 830. The defendant offered evidence that no black had ever served on a petit jury in the county in which the defendant was convicted. Nonetheless, the Supreme Court insulated from review the use of peremptory strikes in an individual case, and held that the defendant had not been denied the equal protection of the law. The Court stated that, if a defendant could show that, in "case after case, whatever the circumstances, whatever the crime and whoever the defendant may be," the prosecutor used peremptory strikes to keep blacks from serving on the jury, the defendant might state a claim under the Fourteenth Amendment. *Id.* at 223–24, 85 S.Ct. at 837–38. This "standard" which the Court articulated in *Swain* has proved virtually impossible to meet. *See Willis v. Zant*, 720 F.2d 1212, 1220 (11th Cir.1983).

When *Swain* was decided, the Sixth Amendment had not yet been held applicable to the states through the Fourteenth Amendment. Since *Swain*, the Supreme Court has developed a jurisprudence relating to a state court defendant's Sixth Amendment right to a trial by jury selected from grand and petit jury venires that represent fair cross-sections of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *see also Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

Recently, a majority of the Supreme Court opened the door for lower courts to reconsider the issue decided in *Swain*. In a statement accompanying the denial of a petition for writ of certiorari in the case of *McCray v. New York*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983), three justices stated that the issue of "whether the Constitution prohibits the use of peremptory challenges to exclude members of a particular group from the jury, based on the prosecutor's assumption that they will be biased in favor of other members of the same group" was an issue that would at a later date be ripe for consideration by the Supreme Court. *Id.* at 961–62, 103 S.Ct. at 2438–39. These three justices wrote that it was appropriate for the Court to delay consideration of the issue until other courts had first given further consideration to the "substantive and procedural ramifications of the problem." *Id.* at 962, 103 S.Ct. at 2438. In a dissent from the denial of certiorari, two other justices said the standard set forth in *Swain* should be reconsidered.

461 U.S. at 963, 103 S.Ct. at 2439. The Supreme Court has subsequently granted certiorari in another case involving the same issue. *See Batson v. Kentucky, cert. granted,* —— U.S. ——, 105 S.Ct. 2111, 85 L.Ed.2d 476 (1985).

Several federal courts have recently reconsidered the issue presented in *Swain.* In *McCray v. Abrams,* 750 F.2d 1113 (2nd Cir.1984), *rehearing en banc denied,* 756 F.2d 277 (1985), the Second Circuit Court of Appeals held that *Swain* was limited to claims brought under the Equal Protection Clause of the Fourteenth Amendment, and that the racially motivated use of peremptory strikes would violate a defendant's Sixth Amendment rights. *See also Booker v. Jabe,* 775 F.2d 762 (6th Cir.1985). In *United States v. Leslie,* 759 F.2d 366 (5th Cir.1985), *reheard en banc* (September 12, 1985), a Fifth Circuit panel held that the use of racially motivated peremptory strikes in federal trials is reversible error under the federal courts' supervisory powers. In the recent case of *Jordan v. Lippman,* 763 F.2d 1265 (11th Cir.1985), this Court discussed but did not resolve the issue of racially motivated peremptory strikes, as the case was decided on other grounds.

■ We do not decide today whether or under what circumstances the racially motivated use of peremptory challenges would require reversal. We hold that appellant in this case completely fails to make a prima facie showing that prospective jurors were excluded on the basis of race. In so holding, we consider it significant that the prosecutor articulated for the record legitimate non-racial reasons for the use of his challenges, which reasons had support in the record of the voir dire. It is also significant that the jury finally chosen included one black juror, despite the fact that the prosecutor had not used all his peremptory challenges.

The judgment of the district court is AFFIRMED.