[Cite as *State v. Garcia*, 2012-Ohio-1795.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                  CASE NO.  12-11-07

      v.

JAIMIE GARCIA,                          O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Putnam County Common Pleas Court
Trial Court No. 2011 CR 33

Judgment Affirmed

Date of Decision:   April 12, 2012

APPEARANCES:

    *Esteban R. Callejas*  for Appellant

    *Todd C. Schroeder*  for Appellee

**WILLAMOWSKI, J**.

{¶1} Defendant-Appellant, Jaimie Garcia, aka Jaime Garcia (hereinafter, "Garcia" or "Uncle Jaime"), appeals the judgment of the Putnam County Court of Common Pleas after a jury found him guilty of twelve counts of gross sexual imposition and one count of rape. On appeal, Garcia contends that the trial court erred when it allowed incompetent juvenile witnesses to testify; when it sentenced him to maximum consecutive sentences; when it failed to ensure a representative sample of Hispanic Americans in the jury pool; and, he also claims he was denied effective assistance of counsel. For the reasons set forth below, the judgment is affirmed.

{¶2} On March 4, 2011, the Putnam County Grand Jury indicted Garcia on sixteen counts of gross sexual imposition, each in violation of R.C. 2907.05(A)(4) and/or (B), each a felony of the third degree, as well as two counts of rape, in violation of R.C. 2907.02(A)(1)(b), both felonies of the first degree. The counts for gross sexual imposition also stated that the victims were less than 13 years of age, and the two counts of rape specified the victims were less than 10 years of age. Prior to trial, the State dismissed two of the counts, and the indictment was amended. Most of the counts in the indictment resulted from disclosures from four of Garcia's young nieces that Garcia had repeatedly inappropriately touched and fondled their private parts, committing felony sex offenses nearly every

weekend when they visited their Uncle Jaime, from Fall 2006 through Spring 2010. Another one of the offenses involved an incident where Garcia forced a young nephew to touch Garcia's penis, and one stemmed from the disclosure of Garcia's adult sister-in-law that Garcia had come into her room sometime in the 1980's when she was a young girl and had put his mouth on her breast.

{¶3} A three-day jury trial was held, beginning on May 31, 2011. The jury heard testimony from the six alleged victims of the sexual abuse, from some of the children's parents/guardians, from two of the children's counselors, and from the Van Wert County Children's Services social worker who investigated the alleged abuse and who had interviewed several of the children after the disclosure of the abuse.

{¶4} Garcia and his wife had a son and two daughters, and they had a large, extended family with several nieces who were close in age to their own daughters. The nieces would often spend entire weekends with the Garcia family so that the girls could play together.

{¶5} At the time of trial in 2011, niece S.A. was nearly 10 years old, and her sister O.A. was 8-1/2 years old. They both testified that they regularly visited Uncle Jaime's house, often every month or even more frequently, during 2007, 2008, 2009, and 2010. They testified that Uncle Jamie would touch and rub their "boobs," their "private place" (their word for vagina), and their "butts," both over

and under their clothing. Sometimes he would kiss them, or he would touch and rub his own penis. He also made them touch him and each other. S.A. finally tearfully disclosed what had happened after a counselor that she had been seeing had a conversation with her about "good touches" and "bad touches" and about the "bathing suit test." Their step-brother K.F., age 6 at the time of trial, only visited Uncle Jaime one time, when he was 5 years old. K.F. testified that Uncle Jaime took out his penis and forced him to touch it.

{¶6} Although the girls testified that these acts occurred too many times to count, the State only charged Garcia with one count of gross sexual imposition for each child for each year during which the abuse occurred: Counts 1, 3, 5, and 8 for S.A.; Counts 2, 4, 6, and 9 for O.A.; and Count 10 for K.F.. O.A. also alleged that Garcia had put his finger inside her "butt" one time in 2009, resulting in Count 7 for rape. Garcia had repeatedly warned the children not to tell anyone.

{¶7} After the investigation began, and when the other members of the family learned of what had occurred, the other aunts asked their daughters if anyone had ever done anything inappropriate. Three more victims admitted that Uncle Jaime had sexually abused them.

{¶8} S.L., who was 14 at the time of the trial, testified that she had also spent many weekends with her cousins at the Garcia home, ever since 2006. S.L. testified to the same sexual fondling that had occurred with S.A. and O.A.. Again,

Garcia was charged with one count of gross sexual imposition for each of the four years S.L. testified that she had endured the abuse: Counts 13, 14, 15, and 16.

{¶9} C.A., who was also 14 at the time of trial, testified that when she was 5 years old in 2002, she visited her cousins and stayed at the Garcia home three or four times. She testified about how Garcia would take her into the bathroom and lock the door and how he would "make me suck his penis." (Tr. p. 659). She described the forced oral sex that occurred at least three times, and testified that he had threatened to hurt her if she told anyone. (Tr. p. 651) C.A. and her family moved to Arkansas shortly thereafter, so she did not spend any more time alone with Uncle Jaimie. Her allegations resulted in Count 12 for rape.

{¶10} And finally, Garcia's sister-in-law, P.A., testified that when she was a young child in the 1980's and Garcia was dating her sister, she was awakened one night by Garcia standing over her with his mouth on her pre-pubescent breast. P.A. told her mother the next day, but nothing was ever done. She never told anyone, except for her husband, until these allegations came to light. This was Count 11 for gross sexual imposition.

{¶11} The defense called Jonathan Morse, the Youth Pastor for Garcia's church, to testify as a character witness for Garcia. Mr. Morse had known Garcia for a couple years, and he testified that Garcia had always been willing to help out with the youth group activities and chaperoning. Mr. Morse had never seen

anything that would make him doubt Garcia's character or lead him to believe that Garcia had committed these acts.

{¶12} And finally, Garcia testified in his own defense. He denied that any of the incidents had occurred and completely maintained his innocence.

{¶13} After deliberations, the jury found Garcia guilty of 13 of the 16 counts. The jury found Garcia not guilty of Count 7 (rape of O.A.), Count 10 (gross sexual imposition of the young nephew, K.F.), and Count 11 (gross sexual imposition of P.A.).

{¶14} On June 6, 2011, the trial court sentenced Garcia to the maximum five year sentence for each of the twelve counts of gross sexual imposition, to run consecutively. Garcia was sentenced to life imprisonment for the remaining count of rape, to run consecutively and to begin after the expiration of the sixty years of imprisonment for the sentences for gross sexual imposition.

{¶15} It is from this judgment that Garcia now appeals, raising the following four assignments of error for our review.

**First Assignment of Error**

**The trial court committed reversible error in allowing two incompetent, minor witnesses to testify as to acts that were highly prejudicial to [Garcia].**

**Second Assignment of Error**

**The maximum sentence is reserved for the worst offenders, and should not have been given in the case at bar**

**Third Assignment of Error**

**The trial court failed to ensure a representative sample of Hispanic Americans in the jury pool, in violation of the U.S. Constitution 6th Amendment, which guarantees the right to a jury trial by peers.**

**Fourth Assignment of Error**

**Garcia did not receive effective assistance of counsel.**

*First Assignment of Error – Competency of Minor Witnesses*

{¶16} In the first assignment of error, Garcia complains that two of the young witnesses, should have been found incompetent to testify. Garcia had requested a competency hearing for the three children who were under the age of ten at the time of trial, S.A., age 9, O.A., age 8, and K.F., age 6. He claims that the answers given at the competency hearing by two of the children, O.A. and K.F., demonstrated that the trial court abused its discretion when it found them competent to testify.

{¶17} Evid.R. 601(A) provides that every person is competent to testify except children under ten years old "who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." *State v. Gutierrez*, 3d Dist. No. 2011-Ohio-3126, ¶ 13. In determining whether a child under ten is competent to testify, the trial court must take into consideration whether the child is able to (1) receive accurate impressions of fact or to observe acts about which the child will testify, (2) recall

those impressions or observations, (3) communicate what was observed, (4) understand truth and falsity, and, (5) appreciate the responsibility to be truthful. *State v. Frazier*, 61 Ohio St.3d 247, 251 (1991). Because the trial court has the opportunity to observe the child's appearance, manner of responding to questions, general demeanor and ability to relate facts accurately and truthfully, its determination will not be reversed absent an abuse of discretion. *State v. McNeill*, 83 Ohio St.3d 438, 442, 1998–Ohio–293.

{¶18} A competency hearing was held on April 27, 2011, and the trial court questioned the children extensively on various topics, including their ages, where they lived, their schooling, their family, their purpose in being in the courtroom, the importance of telling the truth, the difference between the truth and a lie, and the consequences of telling a lie. (Apr. 27, 2011 Tr., pp. 10-68) The trial court also questioned each child as to the allegations that they were making, about what Garcia had done to them, whether what they were saying about Garcia was the truth, and whether they had been told what to say by someone. Based upon this detailed voir dire process, the trial court found all three of the children competent to testify.

{¶19} Our review of the record finds that the answers the children provided were clear, accurate, consistent, and met all of the requirements of the criteria set forth in *Frazier*. O.A.'s answers were extremely accurate and straightforward.

Garcia did not find fault with her answers, but instead attempts to allude that she had been "coached" and that she had changed her story. However, the trial court also questioned each child in detail as to this, and the record does not support this assertion. For example, during O.A.'s voir dire, the following exchange occurred:

Q. Did [the prosecutor] tell you what to say?

A. No.

Q. Okay. What did [the prosecutor] tell you about coming in and talking to me or what you should say, do you remember? Did he tell you anything?

A. Yeah.

Q. What did he tell you?

A. To be brave.

Q. Pardon?

A. To be brave.

Q. To be brave, okay. Did he tell you anything else?

A. Just to tell the truth.

Q. To tell the truth, okay. And did you tell the truth to [the prosecutor]?

A. Yes.

Q. And are you telling the truth today?

A. Yes.

(*Id.* at pp. 46-47)

{¶20} K.F., being the youngest, sometimes did not seem to understand how to answer when first questioned. Garcia takes several of his answers out of context and asserts that this indicates that he was not competent to testify. However, when the trial court would then rephrase a question, or state it in a manner that was more easily understood by the child, K.F. would usually answer appropriately.

{¶21} We do not find that the trial court abused its discretion when it found that K.F. was competent to testify. In any case, even if it would have been error to allow K.F.'s testimony, the issue was moot because the jury found Garcia not guilty of the single count involving K.F. and his testimony. K.F.'s testimony considering the touching was definite, consistent, and corroborated by his two step-sisters. However, there was some discrepancy as to whether it occurred in the spring or the fall, and the jury returned a "not guilty" verdict. K.F. did not testify as to any of the other counts, so his testimony did not involve any prejudice.

{¶22} O.A.'s answers, both at the competency hearing and at trial, were consistently sure, clear and consistent. Furthermore, O.A.'s disclosure of what Garcia had done to her was also before the trial court in testimony from her custodial grandmother, her counselor, and her sister. Therefore, even without O.A.'s testimony, the jury would have heard the evidence of Garcia's sexual abuse.

{¶23} The trial court did not abuse its discretion when it found the that O.A. and K.F. were competent to testify. For the reasons stated above, the first assignment of error is overruled.

*Second Assignment of Error-- Sentencing*

{¶24} Garcia asserts that R.C. 2929.14(B) states that maximum consecutive sentences are only to be imposed "upon offenders who committed the worst forms of the offense * * *." *Id.* He maintains that he never caused any physical harm, and that his actions did not constitute the worst form of the offense. Furthermore, there was no need to protect "the public" because there was no evidence that Garcia had ever harmed a stranger, and he had even served as an exemplary chaperone for his church's youth group. Garcia also complains that the trial court failed to make "detailed findings as required by R.C. 2929.19." (Appellant's Brief, p. 12)

{¶25} Ever since the Ohio Supreme Court's ruling in *State v. Foster*, 109 Ohio St.3d 1, 2006–Ohio–856, "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *State v. Mathis*, 109 Ohio St.3d 54, 2006–Ohio–855, ¶ 37. In *Foster*, the Ohio Supreme Court "excised as unconstitutional R.C. 2929.14(B), (C), and (E)(4), which were portions of Ohio's felony sentencing laws that required the trial

court to make findings when imposing nonminimum, maximum, and consecutive sentences respectively." *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, ¶ 56, citing *Foster* at ¶ 99; *State v. Hodge*, 128 Ohio St.3d 1, 2010-Ohio-6320, ¶ 13.

{¶26} Courts, nevertheless, are still required to comply with the sentencing laws unaffected by *Foster*, such as R.C. 2929.11 and 2929.12, which require consideration of the purposes and principles of felony sentencing and the seriousness and recidivism factors. *Mathis* at ¶ 38. However, a sentencing court does not have to make any specific findings to demonstrate its consideration of those general guidance statutes. *Foster* at ¶ 42.

{¶27} R.C. 2929.11 provides that sentences for a felony shall be guided by the overriding purposes of felony sentencing: "to protect the public from future crime by the offender and others and to punish the offender." R.C. 2929.11(A). In order to comply with those purposes and principles, R.C. 2929.12 instructs a trial court to consider various factors set forth in the statute relating to the seriousness of the conduct and to the likelihood of the offender's recidivism. R.C. 2929.12(A) through (D). In addition, a trial court may consider any other factors that are relevant to achieving the purposes and principles of sentencing. R.C. 2929.12(E).

{¶28} Garcia's basis for this assignment of error cites to statutes that are no longer the law in Ohio. And, although not required to make any "findings," the trial court *did* discuss the reasons why it imposed the sentences that it did, stating

that Garcia's behavior involved multiple sex offenses; that Garcia had shown no remorse; that he had previously been non-compliant to community control sanctions; that "the injury to the victims, being at very young ages, was worsened by the ages of these victims and the fact that the repeated sexual acts of the defendant resulted in significant harm to each of these victims"; that the victims suffered significant psychological harm; that there were multiple victims over an extended period of many years; and, that he used his family relationship to facilitate the offenses. (June 6, 2011 Sentencing Transcript, pp. 16-19)

{¶29} The record demonstrates that the trial court fully complied with all of the applicable statutory requirements pertaining to the imposition of Garcia's sentences. The second assignment of error is overruled.

*Third Assignment of Error – Jury Pool*

{¶30} In this assignment of error, Garcia alleges that the trial court failed to ensure a representative sample of Hispanics in the jury pool, which he asserts is a violation of his Sixth Amendment rights to have a jury drawn from a representative cross-section of the community. Garcia states that all 47 members of the jury pool were Caucasian and none were Hispanic. Garcia complains that he "had no opportunity to cross examine the Court as to its jury selection process" but now asserts that the jury selection process "was not random, was flawed, and

produced a racially discriminatory jury by excluding Hispanics." (Appellant's Br., p. 14)

**{¶31}** The "selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Thus, "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community." *Id.* at 538. However, there is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population," nor is there any right to "a jury of any particular composition." *Id.* "The Sixth Amendment guarantees only the opportunity for a representative jury, not a representative jury itself. * * * The focus, therefore, is properly placed on the procedure of selecting juries, not on the outcome of that process." *Phillips v. Value City Stores, Inc.* (Sept. 16, 1997), Franklin App. No. 96APE12–1711, 1997 WL 578950, at *6.

**{¶32}** Four years after the *Taylor* decision, the United States Supreme Court established a three-part test to demonstrate a prima facie violation of the fair cross-section requirement: (1) the defendant must show that the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in

relation to the number of persons in the community; and (3) the under-representation is due to systematic exclusion of the group in the jury selection process. *Duren v. Mississippi*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). In 1991, the Ohio Supreme Court adopted this test in *State v. Fulton*, 57 Ohio St.3d 120 (1991), paragraph two of the syllabus.

**{¶33}** Ohio's statutory scheme for the selection of jurors is based upon the principle that qualified jurors will be selected in a random manner. *See* R.C. Chapter 2313. Crim.R. 24(F) provides that a prosecutor or a defense attorney "may challenge the array of petit jurors on the ground that it was not selected, drawn or summoned in accordance with law." However, such a challenge must "be made before the examination of the jurors" on voir dire. *Id.*; *State v. Gulley*, 12th Dist. No. CA2005–07–066, 2006-Ohio-2023, ¶ 13.

**{¶34}** Garcia has not provided any evidence, facts, or statistics to support any of his bare assertions. Garcia did not attempt to establish that the Hispanic population is a "distinctive" group in Putnam County. Even if we were to concede this first prong, Garcia failed to present any statistical data which would support his claim that the jury composition was not representative of the population as a whole. Lastly, Garcia failed to provide any evidence that there has been a systematic exclusion of Hispanics from the jury-selection process. *See State v. Stockton*, 3d Dist. No. 17-96-15, 1997 WL 232245; *State v. Hairston*, 9th Dist.

No. 05CA008768, 2006-Ohio-4925 ¶¶ 23-25. Garcia's unsubstantiated claims as to under-representation, pointing solely to his own jury venue, do not demonstrate any systematic exclusion over time.

{¶35} In *Fulton*, the Ohio Supreme Court further stated that:

"[a] defendant may also reasonably bring a federal equal protection challenge to the selection and composition of the petit jury by adducing statistical evidence which shows a significant discrepancy between the percentage of a certain class of people in the community and the percentage of that class on the jury venires, which evidence tends to show discriminatory purpose, an essential element of such cases." *Fulton*, 57 Ohio St.3d at 123-24.

{¶36} Again, Garcia did not provide any statistical data to show the "underrepresentation [of a distinct group] over a significant period of time" or "expose[ ] the selection procedure as susceptible of abuse or racially partial." *State v. McNeil*, 83 Ohio St.3d 438, 444 (1998), citing *Fulton*, 57 Ohio St.3d at 122-24. Accordingly, any claimed challenge under the Fourteenth Amendment also fails.

{¶37} Garcia has failed to support his argument with any statistical data or facts, whatsoever. The third assignment of error is overruled.

*Fourth Assignment of Error – Ineffective Assistance of Counsel*

{¶38} In the final assignment of error, Garcia claims his counsel's representation fell below an objective standard of reasonableness when counsel failed to object to a jury which "was not properly selected and failed to produce any Hispanics." (Appellant's Br., p. 15) He claims that had counsel objected and

a "proper jury" been seated, Garcia "would have received a fair trial and would not have been convicted." (*Id.*)

**{¶39}** To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraphs two and three of the syllabus. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and that strategy and tactical decisions exercised by defense counsel are well within the range of professionally reasonable judgment and need not be analyzed by a reviewing court. *State v. Robinson*, 108 Ohio App.3d 428 (3d Dist.1996).

**{¶40}** As our disposition of the third assignment of error indicated, there was no evidence of any error in the selection of the jury pool, so there was no valid reason for counsel to raise an objection. Therefore, counsel was not ineffective for failing to object. Furthermore, Garcia's' statement alleges that he would not have been convicted if he "would have received a fair trial." However, he does not present any evidence or arguments that would indicate that this trial was not fair in every way, or why a different jury would have reached a different

result. His unsupported and unfounded allegation of prejudice does not meet the standards necessary to find ineffective assistance of counsel. The fourth assignment of error is overruled.

{¶41} Having found no error prejudicial to the Appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and PRESTON, J., concur.**

**/jlr**