IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JULY 1998 SESSION

FILED

February 5, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| GARY JUNE CAUGHRON, | ) | |
| | ) | |
| Appellant, | ) | No. 03C01-9707-CC-00301 |
| | ) | |
| | ) | Sevier County |
| v. | ) | |
| | ) | Honorable John K. Byers, Judge |
| | ) | (By designation) |
| STATE OF TENNESSEE, | ) | |
| | ) | (Post-Conviction -- Death Penalty) |
| Appellee. | ) | |

For the Appellant:

Randall E. Reagan
2643 Kingston Pike
Knoxville, TN 37919


Gerald L. Gulley, Jr.
607 Market Street
P.O Box 1708
Knoxville, TN 3790

For the Appellee:

John Knox Walkup
Attorney General of Tennessee
        and
Kenneth W. Rucker
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

Alfred C. Schumtzer
District Attorney General
        and
Steve Hawkins
Assistant District Attorney General
125 Court Avenue
Sevierville, TN 37862

OPINION FILED:_____


AFFIRMED

Joseph M. Tipton
Judge

## O P I N I O N

The petitioner, Gary June Caughron, appeals as of right from the Sevier County Circuit Court's denial of post-conviction relief as to the guilt phase of his trial. He was convicted in 1990 for the first degree murder of Ann Robertson Jones and received the death penalty. He was also convicted of first degree burglary and assault with the intent to commit rape for which he received consecutive ten-year sentences. The convictions and sentences were affirmed on direct appeal to the Tennessee Supreme Court. State v. Caughron, 855 S.W.2d 526 (Tenn. 1993), cert. denied, 510 U.S. 979, 114 S. Ct. 475 (1993).

The petitioner filed his post-conviction petition on May 18, 1994. Evidentiary hearings were held on November 13, 1996, February 10, 1997, and March 14, 1997, and the trial court subsequently entered its findings and conclusions that granted the petitioner relief as to the ineffective assistance of counsel claim at the penalty phase of the trial but denied the petition in all other respects. The petitioner contends that the trial court erred in denying him full relief, generally claiming the following:

> (1) the petitioner received the ineffective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution at the guilt phase of his trial;
>
> (2) the trial court erred in failing to grant the petitioner funds to retain certain expert/investigative services;
>
> (3) the trial court erred in ruling that the original convicting trial was not defective due to the systematic underrepresentation of women on Sevier County Circuit Court juries.

In response, the state contends that the petitioner received the effective assistance of counsel at the guilt phase of the trial, that the petitioner did not demonstrate a particularized need for an investigator or an expert to examine the jury selection process and jury compositions in Sevier County, and that the petitioner failed to

2

establish that any underrepresentation of women in the venire was a result of the systematic exclusion of women on Sevier County Circuit Court juries.

The supreme court's direct appeal opinion provides the following synopsis of the evidence presented at the petitioner's trial:

> In the early afternoon of July 11, 1987, Christy Jones Scott, the daughter of the victim, 42-year-old Ann Robertson Jones, discovered her mother's partially clothed body lying facedown on a bed in her home in Pigeon Forge. Jones's legs and arms had been bound and tied to the bed with strips of blue terry cloth and pieces of sheer, off-white material like that used for table cloths and curtains. There was a gag tied across her mouth, and strips of the blue terry cloth had been wrapped tightly around her neck.

> According to the state's forensic pathologist, Dr. Cleland Blake, Jones had suffered several "blunt traumatic contusions" to her head. These injuries were consistent with those caused by a blunt or rounded object and would have rendered Jones unconscious at some point. Her skull had been fractured and the cartilage in her nose displaced by the beating. She had bled extensively from her mouth and nose. There was a "patch" of "scraping type of injuries caused by some kind of slender linear object . . . like whipping marks" on the left back side of her chest beneath her shoulder blades. On the right buttock were "three linear imprints, . . . superficial bruises that fit perfectly with four fingers of a hand." Dr. Blake stated that these represented a "hard slap injury to the buttock" inflicted while the victim was still alive. The terry cloth strips around the victim's neck had been pulled so tightly that they had cut off the flow of blood to the victim's brain. The gag, bound so tightly that it cut a deep groove into the corners of the victim's mouth, combined with the hemorrhaging in the nasal passages, had caused her to suffocate. Dr. Blake concluded that Jones had died as a result of asphyxiation while unconscious.

> Examination of the crime scene revealed that the door to the bedroom where the body was found had been forced open. A purse and its contents lay strewn in the hall. The phone lines to the house had been cut. Sometime within the following two or three weeks, Christy Jones Scott discovered a silver, turquoise and coral ring with a thunderbird design lying on the ground beside her mother's truck, which was still parked at her mother's house.

> The key witness in this case was April Marie Ward, who was 14 years old at the time of the killing. Almost everything that the jury learned about Ann Jones's death, other than the description of the crime scene given by investigators, came from April's testimony. That testimony is summarized below.

3

In early summer 1987, according to April, she and the 27-year-old Defendant met and became romantically involved. April Ward's mother, Lettie Marie Cruze, worked at the Turquoise Jewelry Shop in Settler's Village, a group of shops in Pigeon Forge. Ann Jones ran the Wild Hare Tee Shirt Shop in the same shopping center. April and the Defendant, who was working on a nearby construction project, met on the covered portico (commonly referred to as "the porch") of Settler's Village almost every day.

One night, two or three weeks before the murder, Ann Jones made the Defendant Caughron, who had been drinking, leave her shop because he was acting in a disorderly manner. Jones instructed him to stay away. This upset Caughron, who told April Ward that he would like to catch Ann Jones "out one night" and "slice her throat." The Defendant suggested that April accompany Jones to her house after work and give him directions on how to get there. He also asked April to watch Jones as she closed her shop and see where she put her money, and to find out if Jones was married and had a telephone or pets.

Because she knew that her mother would have disapproved of her relationship with the Defendant if she had known his true age, April had told her mother that the Defendant was 18. April then became upset with Ann Jones because of a conversation Jones had had with her mother that led to her mother's disapproval of the relationship. April testified that she hated Jones because she had tried to separate her and the Defendant by going to her mother. April also said that she had told the Defendant what Jones had done.

The week before the murder, according to April, she and the Defendant began talking about going to the victim's house. She said that the Defendant instructed her to bring a towel and a knife "to gut" Ann Jones. On the afternoon of Friday, July 10, around 3:00 or 4:00 p.m., the Defendant came by April's house in an older model green and white 442 Oldsmobile Cutlass that he had just purchased. He told April that he would return that night and that the two would go to the victim's house as planned.

April further testified that after her mother went to sleep, she cut a blue terry cloth towel into strips and waited for Caughron to arrive. He picked her up sometime after midnight. He had been drinking but, according to April was "not drunk." (Another witness, Vicky Worth, testified that she had seen the Defendant drinking beer and smoking marijuana at a restaurant around 10 or 11 o'clock that night.) On their way to Ann Jones's house April and the Defendant drank alcohol and took drugs. They walked to the victim's house from the parking lot of a nearby nursing home, where they had left the Oldsmobile. The Defendant carried with him the handle of a pool stick, around which he had placed gray duct tape, and

4

pieces of the sheer material that he already had in his car. The Defendant gave April a survival knife.

April testified that Caughron entered the house by himself and then summoned her inside. As they went down the hall to Jones's bedroom, April could hear her calling, "Who is it? What are you doing?" She testified that the Defendant kicked in the bedroom door, which was locked. According to April, Jones cried and pleaded with them not to hurt her, but the two told her she was going to die. April later testified that after the Defendant hit Jones several times with the pool stick, Jones fell across her bed, became silent and stopped moaning. As April described the scene, the Defendant turned Jones on her stomach and tried unsuccessfully to have sex with her. Complaining that she had "tightened up on him," he then slapped the victim on the right buttock. Unable to complete the sex act with Jones, the Defendant suggested sex with April. She said that after the two of them undressed, Caughron rubbed the victim's blood on both their bodies as they engaged in sex on the floor beside the bed where Jones lay. Finally, April testified, Caughron insisted that they drink some of the victim's blood from shot glasses that he produced for the occasion.

Although April's testimony was confused as to the exact chronology, it appears that at some point, Jones was gagged to stop her screaming and tied up with the strips of towel and sheer material. April said that the Defendant tightened the terry cloth strip around Jones's neck, causing the victim to gasp. April testified that she then hit the victim in the head two times. After drinking the blood, April said, she went to the bathroom to throw up, but did not. When she returned to the bedroom, she saw the Defendant striking Jones's back with the pool stick. According to April, the Defendant dumped out the contents of Jones's purse as they left and took what appeared to be a large amount of money. Outside, she said, the Defendant used the knife he had given her to cut the telephone lines to make it appear that whoever had killed Jones had not wanted her to use the telephone.[1]

Caughron, 855 S.W.2d at 530-31.

---

[1] The dissenting opinion states the following:

> The majority's recapitulation of the evidence in this case demonstrates that the testimony of the defendant's teenaged accomplice, April Ward, was not only crucial to the state's case against Gary Caughron, it *was* the state's case against him. The FBI developed no forensic evidence implicating Caughron, despite extensive testing on fingerprints, shoeprints, blood and other fluids, and fibers. The boot print on the victim's bedroom door established that someone other than the defendant had kicked in the door. Statements that Caughron made to friends and associates were incriminating to some extent, but for the most part were brief and ambiguous. These statements certainly would not support a murder conviction in the absence of April Ward's testimony. 855 S.W.2d at 544.

The aggravating circumstance found by the jury to warrant the death penalty was that the murder "was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind . . . ." T.C.A. § 39-2-203(i)(5). In reviewing the case, the supreme court concluded that the evidence fully supported the jury's finding of the aggravating circumstance. 855 S.W.2d at 543-44.

The defense proof at the guilt phase of the trial consisted of the testimony of forensic scientists from the Tennessee Bureau of Investigation (T.B.I.) who testified that no evidence gathered at the scene connected the petitioner to the crime. None of the petitioner's fingerprints, blood or other fluids, fibers, hair or shoeprints were found at the scene. Three witnesses testified that it was not unusual for the petitioner to spraypaint his car, and one of these witnesses testified that the petitioner had returned to his grandmother's home on the night of the murder at approximately 11:00 or 12:00 p.m. One of the daughters of the victim testified that Kenny Ogle, an ex-boyfriend, had broken into the victim's home in September of 1986 and threatened the witness and attempted to bind her with strips of cloth.

At the penalty phase of the trial, the state called no witnesses. The defense called the petitioner's aunt to testify concerning the petitioner's family history, a minister to testify that the petitioner was the "[f]inest young prisoner I've ever saw," and a jailer to testify that the petitioner had never presented any real problems. A psychologist, Dr. Madeline Pareau, testified that the petitioner was the son of an alcoholic father and an immature mother. She said that his mother remarried an abusive stepfather, and the petitioner stayed with relatives throughout his childhood. She said that his I.Q. was measured at 78, and he attended special education classes.

## POST-CONVICTION EVIDENTIARY HEARING

Helen Loveday, former clerk of the Sevier County Circuit Court and secretary of the Sevier County Jury Commission, testified concerning the procedure involved in selecting jurors at the time of the petitioner's trial. She testified that the judge of the circuit court would order the jury commission to draw names from the jury pool. The names in the pool came from a box containing about two thousand names. The names came from a pro rata apportionment of persons from each of the seventeen voting districts in the county. Ms. Loveday stated that she did not know exactly how jurors' names were put into the box but that she thought that voting lists, tax lists, and inquiries into the community were used. When the names were drawn from the pool, a list was made and titled "Jury Commission Report." The identical list sent to the sheriff was titled "Sheriff's Venire." Jurors were summoned from the list. On cross-examination, Ms. Loveday stated that she had no knowledge that any person was systematically excluded from either the jury pool or jury venire based upon their gender. On redirect examination, the jury list of persons serving on juries from November 1989 to March 1990 was admitted into evidence.

Alfred Newman, an experienced jury commissioner from Sevier County, testified that in 1989, for example, if three thousand jurors were needed, the commission would get a printout of all the voters in each district, and they would choose ten percent of the voters in each district to be on the list. The commission would try to choose an equal percentage of men and women. The chosen names were then typed, folded and put into a box. Mr. Newman stated that the names always came from the election commission. He further stated that although the names were printed alphabetically from each voting district, the commission would go over the whole list rather than take the first few people whose names started with "A." On cross-examination, Mr. Newman testified that he did not know of anyone who systematically sought to exclude women from sitting on a jury in Sevier County.

7

The petitioner was represented by two attorneys at the trial. The lead attorney testified that he had been retained to represent the petitioner for fifteen thousand dollars. He stated that he had tried two death penalty cases before the petitioner's case and that two investigators and another attorney had assisted him in this case. When questioned about interviewing witnesses, the attorney stated that the investigators interviewed witnesses and placed memoranda in the case file. He could not remember if any of the petitioner's school records had been obtained. He testified that he had not contacted law enforcement from other states in which the petitioner had lived and that neither he nor his investigators had traveled to those states to interview witnesses concerning the petitioner's past.

The attorney stated that the petitioner was interviewed the day before trial by Dr. Pareau, a psychologist. The attorney could not remember what type of psychological evaluation had been performed by Dr. Pareau. He recalled that only four people testified at the sentencing phase of the trial and that he did not request funds for a mitigation specialist to retrieve records from the petitioner's past. He admitted that when the district attorney's office supplied him with the petitioner's arrest record, he did not send anyone to Ohio to check on those prior convictions and the facts surrounding them. He stated that he did not obtain any transcripts from guilty plea hearings or trials in any of these offenses nor did he investigate the validity of the underlying offenses.

The attorney recalled that one of his investigators contacted the petitioner's mother and that contact possibly was made with an aunt. He stated that he obtained only a partial employment history in that he only checked the petitioner's employment in relation to where he was working around the time the murder occurred. He admitted that he did not perform an independent investigation to determine whether the petitioner had a history of alcohol or drug abuse.

8

The attorney further admitted that he did not request the assistance of a blood or fingerprint expert at trial but rather depended on the state expert. He stated that even though one of the items introduced into evidence at trial was fingernail clippings from the victim, and even though allegations had been made that the petitioner had scratches on him the day after the incident, he did not secure the services of an expert to test the fingernail clippings. He stated that he could not recall how many conferences he had with the petitioner before trial but that he would not have spoken to him every day or every week. He stated that he filed motions challenging the constitutionality of the death penalty and a motion requesting a change of venue but that he did not request an expert to investigate and testify as to the extent and possible effects of the media coverage. He stated that he filed a motion to suppress the petitioner's statements to two investigators but that he had only been given the statements on the evening the jury was selected and did not have time to look at them. He also reported that he was not given the statements the petitioner purportedly made to other prisoners until that same evening and that he did not have time to investigate the inmates who testified at trial concerning these statements and their prior records or the circumstances surrounding the petitioner's statements. He recalled that approximately thirty pages of Jencks material had been given to him that same evening. He stated that he had only twelve to sixteen minutes to review inconsistent statements of the state's most important witness, the codefendant, but the state objected that the issue had been raised on direct appeal, and the objection was sustained. The attorney stated that he recalled making special jury requests.

The attorney was questioned concerning a witness named Michael Farreget who purportedly had indicated that he could have identified Robert Truby as being at the victim's house on the evening of the murder. The attorney stated that he could not recall ever having talked to this witness or the state ever having provided him with this witness's statement. He stated that he could not imagine knowing about this

witness and not calling him to testify, but he admitted that the copy of Mr. Farreget's statement must have come from his file because it came from the Capital Case Resource Center.

The attorney recalled that he filed a motion for a continuance because a witness, George Tippens, could not be present on the day of trial due to a back injury. The attorney recalled that Mr. Tippens would have testified that he searched the area surrounding the victim's home for several days and did not find a silver and turquoise ring belonging to the petitioner that was later found by one of the victim's daughters.

The attorney was questioned as to whether he would have called Vicky Worth who allegedly would have testified that she saw the petitioner walking on the night of the murder rather than in a car. She purportedly would have also testified that she saw the petitioner after the time the murder occurred and that he did not have blood or scratches on him.[2] The attorney stated that if he had known about this witness, he would have called her.

The attorney acknowledged that he retained the services of Dr. Dennis Spjut, a psychologist, to examine the petitioner. He acknowledged receiving a letter from Dr. Spjut in which the doctor indicated that the attorney might explore the possibility of alcohol or drug abuse and brain damage. He testified that despite the letter, he did not have the petitioner examined by a neuropsychologist. He also did not call Dr. Spjut to testify on the petitioner's behalf at trial. The attorney stated that he recalled discussing with the petitioner whether he should testify, and it was his recollection that the petitioner decided not to testify at the guilt phase and that he, as counsel, had strong feelings that the petitioner should not testify at the sentencing phase of the trial.

---

[2] The direct appeal record reveals that Ms. Worth was called by the state as a witness and did testify that the petitioner did not appear to have scratches on him following the incident.

10

The attorney recalled that during the jury selection, a Mr. Hodge was presented as a potential juror. He stated that at the time Mr. Hodge was called, the attorney had used all of the petitioner's peremptory challenges, and he challenged Mr. Hodge for cause, but the challenge was not granted. The attorney also recalled that Mr. Hodge blurted out during the cross-examination of April Ward, "What difference does it make?" He stated that he did not object at the time the statement was made because he was hoping that nobody heard Mr. Hodge and that it would go away. He brought the outburst to the trial court's attention outside the presence of the jury after the cross-examination of Ms. Ward. He recalled that it was later determined that another juror heard Mr. Hodge and that the statement was loud enough for the court reporter to hear and transcribe it. The attorney stated that Mr. Hodge was not replaced with an alternate juror until just before the jury retired to deliberate. It was later determined that the alternate juror who replaced Mr. Hodge owned a wrecker service that had once towed the petitioner's car. The attorney testified that he did not interview any of the jurors after the verdict because there was a rule in that particular circuit that counsel could not talk to jurors. He admitted that he did not challenge that rule on appeal.

The attorney admitted that parts of the record, including the voir dire, closing arguments and jury instructions in the guilt phase, were not transcribed and that he did not file a motion to supplement the record with these transcriptions. However, he indicated that co-counsel was primarily in charge of the appeal. The attorney then testified that his investigation had been primarily directed toward the guilt phase because there was little, if any, physical evidence linking the petitioner to the crime.

On cross-examination, the attorney stated that one-third to one-half of his practice at the time of the petitioner's trial was devoted to criminal law. He stated that he had tried at least two prior death penalty cases and numerous homicide and first

11

degree murder cases. He stated that he had practiced extensively before Judge Kenneth Porter, the trial judge in the convicting case, and that he would have strenuously objected to any witnesses called by the state of whom he had not been notified. The attorney stated that he recalled that he had discovery of all the witnesses called by the state. To refresh his memory, the attorney was shown motions to suppress the petitioner's statements and a motion to dismiss challenging the constitutionality of the death penalty. He was also shown a motion in which he requested a jury instruction regarding legal presumptions.

The attorney stated that his criminal investigator, Ms. Van Helton, and Jane LaFollette assisted him in this case and that he had placed a great deal of confidence in their assessments. He stated that the three of them had weekly meetings concerning their investigations.

The attorney recalled that a psychologist had been retained by the petitioner's aunt and that the psychologist examined the petitioner and testified at the sentencing phase of the trial. The attorney stated that it was his understanding that the petitioner's aunt raised him and that she had been primarily responsible for acquiring legal representation for him. She was also the person from whom the attorney obtained most of his information concerning the petitioner's background.

When questioned concerning his performance, the attorney stated that he thought he had done as good a job as he could have done with the judge denying his motion for a continuance although statements of witnesses were not provided to him until the day before trial. The attorney stated that he relied upon experts from the T.B.I. laboratory to testify concerning the lack of physical evidence linking the petitioner to the crime. He testified that it was his opinion that being able to use the state's witnesses to prove the petitioner's case was advantageous and that other experts were not needed.

12

He stated that his investigators had done a good job in this case. In summary, he stated that he thought he raised every issue on appeal that needed to be raised and he had spent adequate time conferring with the petitioner.

The petitioner's post-conviction attorney informed the court that he was not calling the former co-counsel for the petitioner's trial attorney. However, the state was allowed to call co-counsel out of order. Co-counsel testified that he assisted in the defense of the petitioner and that he primarily drafted motions and conducted the research needed for the case. He also stated that he prepared the appellate brief in the case. He recalled that he was present when the lead attorney discussed with the petitioner the option of testifying during the guilt phase of the trial and that there was concern about the petitioner's prior record and certain statements the petitioner had made to detectives and cellmates. He stated that it was the petitioner's decision not to testify. He recalled that the petitioner also elected not to testify at the sentencing phase of the trial and that defense counsel was successful in keeping the petitioner's prior criminal record from the jury. He stated that he was primarily responsible for coordinating the psychological services with Dr. Brietstein's office and that he was satisfied with their findings. He recalled that Dr. Pareau from Dr. Brietstein's office testified at the sentencing phase of the trial. He stated that although the jury voir dire and closing arguments were not transcribed, he did not recognize any errors in those phases of the trial.

On cross-examination, co-counsel testified that he wanted a mug shot photograph of the petitioner taken within three or four days of the crime to be introduced because it showed that the petitioner had no scratches on him. He stated that it was the lead attorney's decision not to use the photograph because he thought it made the petitioner look bad.[3] He was shown a note dated January 27, 1990, and

---

[3] The direct appeal record reveals that the photograph was introduced into evidence.

signed by investigator Jane LaFollette which stated that she had spoken with Dr. Brietstein that day, two days before trial, and that he told her that he could not be at the trial. Co-counsel recalled that Dr. Brietstein suggested that Dr. Pareau examine the petitioner and that he requested that the petitioner be transported to Dr. Pareau's office. Co-counsel recalled that Dr. Pareau had not spoken with the petitioner before that time.

Co-counsel acknowledged that he did not request that the state's closing argument be transcribed, but he recalled that he included as an issue on appeal a statement made by the district attorney concerning "running rabbits." The state responded that this issue was waived because closing arguments had not been transcribed, and the Tennessee Supreme Court refused to address the issue. Co-counsel admitted that he did not have the voir dire transcribed even though he raised issues on appeal concerning certain jurors. He also stated that he did not raise issues concerning the constitutionality of the death penalty on appeal.

Bonnie Loveday, an employee of the Sevier County Election Commission, testified that she worked as Register at Large for eighteen and one-half years. Ms. Loveday was shown copies of sheriff's venires for a two-year period. According to Ms. Loveday's calculations, three hundred and fifty-five males and one hundred and fifty-two females could be identified on the lists. However, approximately one hundred and forty persons whose names were on the venires could not be found on the computer in order to verify their gender.

Dr. Ann Marie Charvat, a certified clinical sociologist, testified that she had been involved in two capital case post-conviction hearings and three or four capital case sentencing hearings before her testimony in this case. She said that she is a mitigation specialist whose role is to identify and substantiate mitigating factors.

14

Dr. Charvat explained that she met the petitioner in 1994 when she was employed by the Capital Case Resource Center, and she was asked to develop a social history for him. She stated that she first met with the petitioner and interviewed him concerning his background. She said she then constructed a time line in which she attempted to document the chronology of the petitioner's life. In constructing the time line, Dr. Charvat stated that she interviewed approximately forty people. Dr. Charvat testified that she traveled to Peoria, Illinois, where the petitioner grew up, and substantiated severe physical abuse and neglect from the petitioner's parents. She stated that she learned that the petitioner had been an exploited child who had suffered physical abuse, extreme emotional maltreatment, and sexual abuse. She stated that the witnesses that she interviewed in Peoria stated that no one had contacted them prior to the petitioner's trial.

Dr. Charvat explained that in addition to interviewing witnesses, she collected documents that revealed that the petitioner had attended thirteen different schools. She also learned that the petitioner was absent from school an inordinate amount of time and that at times, agencies and schools had attempted to intervene. However, when the petitioner's parents were contacted by authorities, they would move. Some of the people Dr. Charvat interviewed stated that the petitioner stayed out of school on numerous occasions because he was bruised, and his stepfather did not want authorities to learn of the abuse.

Dr. Charvat explained that she reviewed the mitigation efforts made on the petitioner's behalf at trial. She stated that after reviewing the transcripts of the trial and interviewing a number of people who participated in the hearing, she believed mitigation efforts were insufficient. She questioned Dr. Pareau's reliance on one interview with the petitioner and his parents in reaching an opinion on mitigation. Dr. Charvat also noted that no one interviewed people in Illinois about the petitioner even

though the petitioner spent his childhood there. She stated that it was her professional opinion that the social history of the petitioner as established at the sentencing hearing was inadequate.

Dr. Mary Pam Auble, a neuropsychologist, testified that she conducted an evaluation of the petitioner based upon an interview with the petitioner, various background records including Dr. Charvat's report, testimony from the sentencing hearing, and a psychological evaluation of the petitioner conducted prior to trial by Dr. Pareau. She also said she conducted a neuropsychological evaluation of the petitioner that included the results of standardized tests taken by the petitioner involving the assessment of intelligence, memory, attention, and personality. Dr. Auble's report was introduced into evidence. Dr. Auble testified that her assessment revealed that the petitioner suffered from dementia and moderate depression. She defined dementia as memory impairment.

Dr. Auble stated that because the tests themselves do not reveal much about a patient's history, she relied on the petitioner's social history to determine that he had suffered physical and sexual abuse. She stated that he had no consistent care givers and that his family history revealed that his father and brother had suffered from a form of psychosis.

Dr. Auble stated that her evaluation revealed that when the petitioner is in an emotional or stressful situation, his thinking becomes muddled, and he avoids those types of situations. She testified that intoxicants would decrease the petitioner's impulse control and affect his reasoning. It was Dr. Auble's opinion that the petitioner would have significantly less control over his actions in emotional situations, and his control would be worse if he were intoxicated. Dr. Auble stated that prior to the

16

petitioner's trial, Dr. Pareau had not conducted a neuropsychological evaluation. She stated that additional testing should have been done.

On cross-examination, Dr. Auble admitted that the testing similar to hers that Dr. Pareau performed presented similar results. She admitted that being in prison would contribute to a person's depression. She also admitted that if the petitioner were facing trial on that day, she would find him competent to stand trial. On redirect examination, Dr. Auble stated that she believed that the petitioner would have a diminished capacity to form specific intent in a highly emotional situation in which he had consumed intoxicants.

Holly Carr, deputy clerk for the Sevier County Circuit Court Clerk's Office, testified that she was the caretaker of the criminal filings in that office. She submitted a certified copy of the final jury in the petitioner's trial. The copy revealed that the jury was composed of six males and six females. The clerk also submitted a certified copy of the death penalty notice in the petitioner's case. On cross-examination, Ms. Carr testified that on the verdict form, the jurors did not use the language that the murder was heinous, atrocious or cruel but used terminology including cruel, torture and depravity. She also admitted that she did not know whether the petitioner's counsel received a copy of the notice that the state would be seeking the death penalty before trial.

The trial court entered written findings of fact and conclusions of law stating that the petitioner's claims concerned four general areas: (1) the ineffective assistance of counsel, (2) trial court errors, (3) prosecutorial misconduct and (4) the constitutionality of the death penalty statutes. The trial court concluded that the petitioner failed to show prejudice by any of the accusations made against counsel during the guilt phase of the trial. It also stated that the petitioner did not prove

17

ineffective assistance of counsel during the appellate stage of his trial. However, the court concluded that the petitioner met his burden of proof relative to the ineffective assistance of counsel at the sentencing phase of the trial and that there was a reasonable probability that if mitigation evidence had been presented, the result of the sentencing phase of the trial would have been different. The trial court ordered a new sentencing hearing.

The trial court concluded that alleged guilt phase errors concerning the convicting court's refusal to grant funds for expert and investigative services, failure to advise the petitioner regarding his failure to testify, admission of irrelevant and prejudicial evidence, failure to allow the petitioner to depose George Tippens, failure to address juror misconduct, and denial of the petitioner's right to compulsory process were either waived for failure to raise them at an earlier hearing or were without merit because the petitioner had failed to present adequate proof at the post-conviction evidentiary hearings. The trial court concluded that alleged penalty phase errors of the convicting court were moot due to the trial court's decision to grant a new sentencing hearing.

The trial court concluded that all claims regarding prosecutorial misconduct were either waived for failure to present them at an earlier hearing or that the petitioner failed to meet his burden of proof due to the failure to present proof at the evidentiary hearings. All errors concerning the constitutionality of the death penalty were deemed waived for failure to raise them at an earlier hearing or were found to be without merit.

In reviewing the trial court's determinations, we are guided by certain rules under the post-conviction law applicable to this case. The burden was on the petitioner at the hearing to prove his case by a preponderance of the evidence. On appeal, the

18

trial court's findings are conclusive unless the record preponderates against its determinations. Turner v. State, 698 S.W.2d 90, 91 (Tenn. Crim. App. 1985). The burden now rests on the appealing party to illustrate why the record preponderates against the judgment. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

## I. EFFECTIVE ASSISTANCE OF COUNSEL

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is upon the petitioner to show (1) that counsel's performance was deficient, and (2) that, but for the deficiency, there is a reasonable probability that the result would have been different. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). Also, we note that the approach to the issue of the ineffective assistance of counsel does not have to start with an analysis of an attorney's conduct. If prejudice is not shown, we need not seek to determine the validity of the allegations about deficient performance. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

The petitioner first asserts that counsel was ineffective for failing to have the jury voir dire, the closing arguments, and the guilt phase jury instructions transcribed. According to the petitioner, the problem is compounded because the court reporter and the trial court clerk have now stated that the tapes of the hearing have been misplaced and possibly destroyed. The petitioner contends that the transcript of the voir dire was especially important because two issues regarding jurors were raised on appeal. On appeal, the petitioner questioned the qualifications of two jurors, one who was related to a state witness by marriage and another who owned the wrecker service that towed the petitioner's car when a state's witness worked on it. However, the supreme court addressed the qualification issue on direct appeal and concluded that the petitioner had not shown that the jurors were biased or prejudiced.

19

The petitioner raised a second issue about a juror who made inappropriate comments during the cross-examination of the state's primary witness, April Ward. The juror commented, "What's the difference?" when defense counsel asked Ms. Ward why she lied to law enforcement officers regarding whom she had told about the crime. However, on direct appeal, the supreme court dismissed this issue, concluding that the petitioner waived the issue by not requesting a mistrial after the juror was dismissed by the trial court. The supreme court further concluded that even if not waived, the issue was without merit because there was no indication in the record that jurors who remained were prejudiced by the juror's remark.

The petitioner also contends that counsel was ineffective for failing to have the jury instructions and closing arguments from the guilt phase of the trial transcribed. At the post-conviction hearing, co-counsel testified that he recalled that the aforementioned portions of the transcript had not been prepared but stated that he did not raise any issues on appeal that would have required those portions. The direct appeal record substantiates co-counsel's recollection.

Post-conviction counsel inferentially asserts that the petitioner's trial attorneys were ineffective per se by their failure to have portions of the trial transcribed. However, in Bransford v. Brown, 806 F.2d 83, 86-87 (6th Cir. 1986), the Sixth Circuit Court of Appeals concluded that although the jury instructions portion of the transcript was not prepared and although the missing portions were irretrievably lost, the petitioner should be denied relief because he failed to present the court with anything upon which it could base a finding of prejudice. As in Bransford, the petitioner in the present case has failed to show that he was prejudiced by the omission of these portions of the transcript.

The petitioner next asserts that trial counsel was ineffective in failing to investigate adequately all possible defenses so as to enable him to make an informed and reasonable decision as to a theory of defense. The petitioner contends that trial counsel was on notice of the need to investigate the petitioner's mental state but did not do so. He contends that this failure rendered his counsel unable to make informed decisions or adequately and effectively represent the petitioner.

At the post-conviction hearing, the petitioner's lead attorney testified that he retained the services of Dr. Dennis Spjut, a psychologist, to examine the petitioner prior to trial. He acknowledged receiving a letter from Dr. Spjut in which the doctor indicated that the petitioner functioned in the borderline range of intelligence and that the attorney might explore the possibility of alcohol or drug abuse resulting in symptoms similar to brain damage. He admitted that he did not have a neurologist or neuropsychologist examine the petitioner but stated that he obtained the services of another psychologist from the office of Dr. Brietstein to examine the petitioner the day before trial in order to prepare for sentencing. The attorney repeatedly stated that his theory of defense was that the petitioner did not commit the crime and that his primary focus had been on the guilt phase of the trial due to the lack of physical evidence connecting the petitioner to the crime.

In assessing the effectiveness of counsel, we are guided by the principle that this court's responsibility is not to second guess strategic and tactical choices of counsel. In fact, we will defer to counsel's tactical choice if the choice was reasonable when viewed from counsel's perspective at the time the choice was made and if it was based upon adequate preparation. Strickland v. Washington, 466 U.S. at 689, 104 S. Ct. at 2065; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); United States v. Decoster, 487 F.2d 1197, 1201 (D.C. Cir. 1973).

In this case, the petitioner denied committing the crime, and counsel presented evidence that he had been wrongly identified as the perpetrator. The petitioner's trial counsel was aware of the petitioner's mental problems but chose not to pursue that evidence in the guilt phase of the trial. A defense of diminished capacity based upon the petitioner's borderline intelligence and alcohol and drug abuse could have compromised his primary defense that he did not commit the offense. We conclude that counsel was not ineffective for failing to present this defense in the guilt phase of the trial.

The petitioner next asserts that because substantial exculpatory information was either withheld by the prosecution or was not investigated and used by counsel in the petitioner's defense, the confidence in the outcome of the trial was undermined in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The petitioner initially argues that he was not given the statements of April Ward, the state's chief witness, until late in the afternoon before the morning she was to testify. However, this issue was addressed on direct appeal, and a majority of the Tennessee Supreme Court concluded that "defense counsel, and his defense team, were given a reasonable opportunity to examine and prepare to use the statements in cross-examining April Ward." Caughron, 855 S.W.2d at 535. Accordingly, this issue has been previously determined. T.C.A. § 40-30-112(a) (repealed 1995).

The petitioner also argues that either the state withheld the statements of Michael Farreget and Vicky Worth or that if his attorney knew of Mr. Farreget's or Ms. Worth's statements, he was ineffective for failing to call them as witnesses. The statement made by Mr. Farreget was to Special Agent David Davenport of the T.B.I. and related that he observed a dark-colored car sitting in front of the victim's house around 7:00 or 7:30 p.m. on the day before her body was discovered. Mr. Farreget

22

identified Robert Trudy's car as the one he had observed. The statements allegedly made by Vicky Worth reflected a lack of noticeable scratches on the petitioner and the petitioner's lack of transportation on the night of the murder.

At the post-conviction hearing, the attorney testified that he did not recall having been shown the statement of Michael Farreget, but he later admitted that the copy of the statement must have come from his file because it came from the Capital Case Resource Center. He testified that he did not know how the statement got into the file but that had he seen it, he would have called Mr. Farreget as a witness. He then admitted that the statement could have been in the information given to him during trial. He testified that he did not recall the name of Vicky Worth but did remember that there were several people employed near the victim's business who said they had seen the petitioner the morning following the killing. The attorney stated that if he had known that someone had allegedly seen the petitioner around the time of the murder who would have testified that the petitioner was not driving a car at that time, he would have called her as a witness.

To establish a violation under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), the petitioner must prove that the state suppressed evidence, that the evidence was favorable to the defense, and that the suppressed evidence was material. See Strouth v. State, 755 S.W.2d 819, 828 (Tenn. Crim. App. 1986). In the present case, the petitioner has failed to prove that the state withheld this evidence. The evidence reflects that a copy of Mr. Farreget's statement came from a file counsel sent to the Capital Case Resource Center. The record does not contain Ms. Worth's alleged statement.[4] This court does not consider statements made by counsel during a hearing

---

[4] The direct appeal record reveals that Ms. Worth was called as a witness for the state. She testified that she had seen the petitioner between 10:00 p.m. and 11:00 p.m. on the night of the murder and that he had been drinking and smoking marijuana. On cross-examination, counsel for the petitioner questioned her concerning the petitioner's appearance on the day following the murder, and Ms. Worth responded that she had not noticed any cuts or scrapes on him.

23

as evidence.  See State v. Dykes, 803 S.W.2d 250, 255 (Tenn. Crim. App. 1990).  The petitioner has failed to prove a due process violation.

The petitioner claims in the alternative that the state failed to provide this exculpatory information in time for his attorney to adequately prepare a defense.  However, this issue has been previously determined.  In the majority opinion of the Tennessee Supreme Court, the court determined that the trial court did not abuse its discretion in denying a continuance to allow the petitioner time to investigate persons named as suspects in certain statements given to the defense by the state.  Caughron, 855 S.W.2d at 535.  The court concluded that the petitioner had "failed to show the materiality and relevance of any evidence such an investigation would yield."  Id. at 534.

Also in the alternative, the petitioner argues that his trial attorney was ineffective for failing to use the statements of Mr. Farreget and Ms. Worth.  However, when a petitioner contends that counsel failed to present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.  By presenting them, the petitioner can establish that the failure to have a known witness testify resulted in the denial of evidence material to the petitioner.  See State v. Black, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).  In this case, the petitioner did not present the testimony of Mr. Farreget or Ms. Worth.  Under these circumstances, the trial court had insufficient evidence to determine whether the failure to call the witnesses was deficient performance by his trial attorney or if such failure constituted material prejudice to the petitioner's cause.  Ineffective assistance of counsel has not been shown.

## II.  DENIAL OF EXPERT AND/OR INVESTIGATIVE SERVICES

The petitioner claims that the trial court abused its discretion in denying his request for the expert services of Mr. Ronald Lax, an investigator employed by

24

Inquisitor's, Inc., the services of an expert to examine the jury selection process and the composition of the jury, the services of Dr. Chris Sperry, a pathologist with the Fulton County Medical Examiner's Office and the services of Dr. Murray Smith, Medical Director for Baptist Drug and Alcohol Center. The petitioner contends that the services of Mr. Lax were needed to trace former cellmates who testified for the state at trial concerning alleged statements of the petitioner. He submits that the services of jury experts were needed to investigate the systematic exclusion and/or underrepresentation of women from the Sevier County Circuit Court venires. He asserts that the expert services of Dr. Sperry were needed to review and rebut the testimony of the state's medical witness at trial, Dr. Cleland Blake, as to the nature and timing of the victim's death. Last, he contends that the services of Dr. Murray Smith, Medical Director of Baptist Hospital Drug and Alcohol Center, were needed in order for him to show the effects of alcohol on the mental state of a person with a marginal I.Q.

The trial court initially granted funds for the expert services of a neuropsychologist and for the services of a paralegal to investigate and collect information regarding the question of underrepresentation of women in the Sevier County jury pool. The trial court issued a second order, renewing its grant of funds for the expert services of a neurologist but denying all other requests, concluding that the petitioner's documentation did not support a particularized need for the services. A third order was issued granting the petitioner funds to secure the services of a legal expert. Finally, a fourth order was issued granting the petitioner funds to secure the services of a mitigation specialist, Anne Marie Charvat, but concluding that a particularized need had not been shown to warrant funds for investigative services to conduct juror interviews and to discover the outcomes of the trials of state inmate witnesses who testified against the petitioner. The trial court also denied the services of a demographer and a statistician for the same reason.

In Owens v. State, 908 S.W.2d 923, 928 (Tenn. 1995), the Tennessee Supreme Court held that T.C.A. § 40-14-207(b) applies to post-conviction cases and that petitioners can receive state paid professional services. However, the court cautioned that its application of T.C.A. § 40-14-207(b) to post-conviction capital cases "should not be interpreted as a 'blank check' requiring trial judges to authorize funds in every case." Id. In order to receive state funding for expert services, the petitioner must demonstrate that the "services are necessary to ensure the protection of the petitioner's constitutional rights." Id. As the court explained, "a petitioner must demonstrate by specific factual proof that the services of an expert or an investigator are necessary to establish a ground for post-conviction relief and that the petitioner is unable to establish that ground for post-conviction relief by any other available evidence." Id.

The discretion to grant a request for expert services rests with the trial court, and its decision will not be reversed on appeal unless there is a showing of an abuse of that discretion. State v. Cazes, 875 S.W.2d 253, 261 (Tenn. 1994). Upon a review of the record, we conclude that the trial court did not abuse its discretion in denying funding for the services in question.

In his motions requesting an investigator, the petitioner failed to specify by factual proof that such services were necessary to establish a ground for post-conviction relief and that he was unable to establish such ground by other reasonable means. At the hearing on the motion requesting an expert to investigate jury selection and jury composition and a statistician to review the findings, the petitioner's present attorney admitted that he had acquired much of the needed information concerning the jury selection but claimed that he needed a statistician to interpret the information. The trial court determined that a statistician was not needed because the court could make a determination on the proof before it whether the percentage of women in the venire

26

was statistically disproportionate. Furthermore, because the petitioner was granted a new sentencing hearing, the trial court's denial of funds for medical experts is now moot. Moreover, Dr. Smith's testimony would have been cumulative in light of Dr. Auble's testimony that intoxicants would have decreased the petitioner's impulse control. We conclude that the trial court acted within its discretion in denying the requested services.

### III. UNDERREPRESENTATION OF WOMEN ON SEVIER COUNTY JURIES

The petitioner asserts that he set forth a prima facie case that there was a systematic underrepresentation of women on the jury venire of his specific case and on the venire of juries for the preceding two years in Sevier County. He points to the fact that his jury panel was only thirty percent women, although women in Sevier County comprised about fifty percent of the adult population.

First, we note that the record reveals that the trial court failed to state findings of fact and conclusions of law regarding this issue as required by T.C.A. § 40-30-118(b). However, even if a trial court fails to comply with this duty, a reversal is not warranted if the record reflects the reasons for the trial court's actions. State v. Swanson, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984). In Swanson, this court stated that the primary intent of the statute was "to facilitate appellate review of the lower court's proceedings . . . ." Id. If the record contains the reasons for the trial court's action sufficient to effectuate meaningful appellate review, then we may consider the issues even though there has not been full compliance with T.C.A. § 40-30-118(b). Such a record exists in this case.

In Taylor v. Louisiana, 419 U.S. 522, 95 S. Ct. 692 (1975), the United States Supreme Court held that women could not be systematically excluded from jury service. The Court determined that Louisiana's constitutional and statutory provisions

27

exempting women from jury service unless they had previously filed a written declaration of their desire to be subject to such service were unconstitutional because they violated the fair cross-section requirements of the Sixth and Fourteenth Amendments. Taylor, 419 U.S. at 537-38, 95 S. Ct. at 701-02. In Duren v. Missouri, 439 U.S. 357, 99 S. Ct. 664 (1979), holding unconstitutional a Missouri statute that excluded women from jury duty if they requested exemption, the Court reaffirmed its holding in Taylor. It stated as follows:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

Duren, 439 U.S. at 364, 99 S. Ct. at 668.

In the present case, we conclude that the petitioner has not met the final two requirements. At the post-conviction hearing, Bonnie Loveday, an employee of the Sevier County Election Commission, was shown copies of sheriff's venires from November 1988 until November 1989. Ms. Loveday determined that the venires contained three hundred and fifty-five males and one hundred and fifty-two females on the computer list. However, Ms. Loveday could only speculate as to the gender of approximately one hundred and forty persons who had been on the list but could not be found in the computer records. Although the petitioner asserts that the venires for the two years up to and including the one for his trial were only thirty percent female whereas adult women in Sevier County comprised about fifty percent of the total population, the computer records do not support this claim.

More importantly, the petitioner has failed to establish that any underrepresentation was due to the systematic exclusion of the group in the jury selection process. At the hearing, Helen Loveday, former clerk of the Sevier County

28

Circuit Court and secretary of the Sevier County Jury Commission, testified that at each court term, the judge of the Circuit Court would order names to be drawn from the jury pool. The jury pool came from a secured box containing approximately two thousand names, and these names came from a pro rata apportionment of persons from the seventeen voting districts in the county. She stated that she did not know exactly how jurors' names were selected for the box but that she had no knowledge that any person was systematically excluded from either the jury pool or jury venire based upon gender.

Alfred Newman, a jury commissioner from Sevier County and commissioner at the time of the petitioner's trial, testified that names for the jury pool were selected from a printout of voters in each district. He stated that ten percent of the names of voters in each district would be chosen, typed, and put in the secured box. He testified that the commission would try to choose an equal percentage of men and women. Before each term of court, the commission would remove the number of names required and place them on the jury commission report which was later copied as the sheriff's venire. He stated that the selection was conducted blindly and that he did not know of anyone who systematically sought to exclude women from sitting on a jury. From these facts, we conclude that the petitioner has failed to establish a prima facie case of systematic exclusion.

In consideration of the foregoing and the records of the petitioner's original trial, direct appeal and post-conviction proceeding, we conclude that the trial court's determinations in this case are correct. The judgment is affirmed.

_____
Joseph M. Tipton, Judge

CONCUR:

_____

29

Gary R. Wade, Presiding Judge

_____
David H. Welles, Judge