# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-00175-SCT

*DARYL LAMONT REDD a/k/a D-BO*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/08/2022 |
| TRIAL JUDGE: | HON. GEORGE M. MITCHELL, JR. |
| TRIAL COURT ATTORNEYS: | LEE JACKSON HOWARD, V |
| | MICHAEL GUNTHER HOWIE |
| | A. E. (RUSTY) HARLOW, JR. |
| | KATHI CHRESTMAN WILSON |
| | MORGAN KAY JACKSON |
| COURT FROM WHICH APPEALED: | WEBSTER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | A. E. (RUSTY) HARLOW, JR. |
| | KATHI CHRESTMAN WILSON |
| | MORGAN KAY JACKSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/27/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KITCHENS, P.J., BEAM AND ISHEE, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Daryl Redd was indicted on two counts of aggravated assault in Webster County. A jury found Redd guilty of the first count—aggravated assault, causing bodily injury to April Stevenson by shooting her in the leg with a deadly weapon. The jury found Redd not guilty of the second count—aggravated assault, attempting to cause bodily injury to Jordan Gaston by shooting at him with a deadly weapon.

¶2.     Redd appeals from his aggravated-assault conviction and sentence, claiming (1) the evidence was insufficient to support the jury's verdict and/or the verdict was inconsistent with the overwhelming weight of the evidence; (2) the trial court committed reversible error by failing to rule on various defense objections; (3) the State argued facts not in evidence during closing arguments; and (4) Redd was prejudiced because the jury venire failed to provide an adequate number of potential jury members of Redd's race.

**FACTS**

¶3.     Shortly after midnight on July 5, Stevenson and her nephew Gaston, along with other family members, went to a local pool hall in Eupora, Mississippi.  As the group walked up to the entrance, Redd was standing near the door and said to the group, "Who invited you f****ts."  Gaston asked Redd what he said, and Redd repeated it.

¶4.     Gaston pushed Redd, Redd hit Gaston, and a fight broke out between the two men. According to Stevenson's testimony, after others broke up the fight, Redd said he was "fixing to kill you Mfers," and he left the pool hall.  Stevenson and Gaston remained inside the pool hall.

¶5.      Redd was then seen outside carrying what appeared to be an "AK-47" type rifle. Stevenson saw Redd from inside the pool hall carrying the weapon, and she told Gaston that they needed to run.  But they were unable to get out of the pool hall before Redd reentered.

¶6.     According to Stevenson, Redd walked into the pool hall holding the rifle.  Stevenson stepped in front of Gaston because she did not know if Redd "was going to kill me or my

2

nephew." Stevenson told Redd, "don't do that[,] [d]on't do that." According to Stevenson, Redd then "just shot me."

¶7. Two photograph's of Stevenson's right leg were submitted into evidence. The first showed a small round hole just above the knee. The second showed a large gaping hole at the back of her leg.

¶8. Gaston testified that after his and Redd's fight, Redd walked out of the pool hall and returned with what look like an "AK-47" rifle. Redd said, "I'm about to kill him[,]" referring to Gaston.

¶9. According to Gaston, "[Redd] shot my auntie. Because she was saying, 'No. Don't do it.' And he was, like, it was instant. He shot her."

¶10. When asked to elaborate how Redd was holding the gun when he shot Stevenson, Gaston said, "Because my auntie was within close proximity of him, about 8 to 10 inches, it was not pointed all the way up. Because it is almost impossible for it to be pointed all the way up. And that's how she ended up being shot in her leg." Gaston said no one besides Redd was touching the gun when the shot was fired.

¶11. Gaston said that once Redd shot Stevenson, Gaston's cousin Antwayn Patterson ran over and began wrestling Redd for the gun. And Redd kept saying, "I am about to kill him." Gaston told the jury that at no time did Redd point the gun at him, Gaston.

¶12. Patterson testified that, prior to the shooting, he was passing by the pool hall in his vehicle when he saw people arguing and shoving each other outside the pool hall. Patterson got out of his vehicle and saw that it was Redd and his cousin Gaston who were fighting.

3

After the fight was broken up, Patterson saw Redd walk away from the pool hall; Patterson did not see where. He then saw Redd return holding a gun.

¶13. Patterson said everyone started running. Patterson followed behind Redd trying to talk to him and calm him down. Patterson knew Redd was looking for Gaston, and Patterson thought Gaston might have gotten in his car and left. He said Redd walked into one of the doors to the pool hall, and Patterson followed in behind him. Patterson then heard a shot. Patterson did not know that anyone had been shot until he saw blood on the ground.

¶14. Patterson said he then "tussl[ed]" with Redd for the gun "and somehow [he, Patterson,] just grabbed the clip out [of] the gun[.]" Patterson was able to get the gun out of Redd's hands after Redd calmed down. Patterson said that he handed the clip to Redd's brother and that someone had "snatched" the gun from him, Patterson. Patterson said he did not find out until afterwards that Stevenson had been shot.

¶15. Chief Lawrence Caradine with the Eupora Police Department testified that Stevenson had called him around 12:05 am on July 5 saying that she was at the pool hall and that Redd was going to get a gun. Chief Caradine went to the pool hall. When he arrived, somebody was "toting April Stevenson towards me." He said that Stevenson had a hole in her leg, and she said that Redd had shot her. Chief Caradine called for an ambulance.

¶16. Chief Caradine went to look for Redd. He found Redd in the pool hall sitting on a couch. Chief Caradine said there was blood everywhere inside the pool hall, which they were about to mop up until he told them to stop because it was evidence.

4

¶17. Chief Caradine asked Redd what happened. Redd "said they jumped on him and he left [the pool hall] and went and got his gun and came back in for his protection." Redd said he thought his leg was broken. Chief Caradine looked at Redd's leg and saw that it was swollen. He called an ambulance for Redd also.

¶18. Chief Caradine recovered a shell casing just inside the entrance to the pool hall. The gun was not recovered. Chief Caradine told the jury that he did not know exactly what kind of gun the shell casing came from, but generally it would come from an "automatic sawed off rifle." The shell casing was submitted into evidence at trial.

¶19. Chief Caradine said he took cell-phone pictures inside the pool hall around where the shooting occurred. He said these pictures were lost when the police department received new phones. Chief Caradine, however, was wearing a body camera. Video footage from the camera, consisting of Chief Caradine's interview with Redd at the pool hall, was submitted at trial during the State's rebuttal to the defense's case-in-chief.[1]

¶20. Israel Roby testifed on behalf of Redd. Roby was leaning against one of the pool tables when he heard Gaston and Redd arguing with each other near the pool hall entrance. Roby said he heard Redd call Gaston a "f****t." Gaston then hit Redd, knocking him to the ground. Gaston picked Redd up by the collar and hit him "3 or 4 more times." When Redd got up, he was dazed. Roby heard someone say that Redd was going to get a gun. Roby said he "did like everybody" and "went outside because bullets don't have eyes." He did not see what happened afterwards inside the pool hall.

---

[1] Because the State sought to submit the video footage on rebuttal, it was limited, by agreement of the parties, to Chief Caradine's interview with Redd inside the pool hall.

5

¶21. Redd was the only other person to testify for the defense. He admitted to calling Gaston a derogatory name when Gaston and Stevenson first arrived at the pool hall. Redd said he turned to walk away from Gaston afterwards, but Gaston hit him on the back of the head, and Stevenson hit him on the head with a gin bottle. Redd said he fell to the floor. Gaston, Stevenson, and her cousin Haven Patterson then began stomping and kicking him. And Gaston then began hitting him with a pool stick. Redd said he managed to crawl out of the pool hall and made it to his car, which he said was parked by the front door to the pool hall.

¶22. Redd said his car had been broken into and that all the stuff from his glove compartment was on the floor. His wallet was missing, and he realized he did not have his car keys and house keys, which had been on a clip attached to his belt loop. Redd said he was still dazed and disoriented from Gaston, Stevenson, and Haven jumping on him.

¶23. While he was sitting in his car, Redd saw Josh Yates give Haven "a gun to come at me." Redd said he heard Haven say, "Come on, man, let's go get this." Redd said he also saw Stevenson's cousin Chance Cooper remove a gun from his backpack and that Cooper "was coming toward me with it." Afraid that they were going to gang up on him again, Redd said he went back into the pool hall to find his keys. Redd assumed it was safe because he thought everyone had run out of the pool hall.

¶24. Redd said that as he was walking back inside the pool hall, his leg gave out, and he walked toward the couch to take a look at it. As he did so, Patterson came from beside him

6

and tried to snatch the gun out of his hand, "and it went off." According to Redd, that is how Stevenson got shot in the leg.

¶25. Redd said he had "no intent or . . . ill-will to shoot" either Stevenson or Gaston. He never pointed his gun at Gaston, and he never said he was going to kill either one of them. Redd said that after the gun fired, he released the clip out of the gun and gave it to Patterson. He then cocked the next round out of the chamber and "let the gun go." Redd said he then fell to the floor because of his leg and they helped him to the couch. Afterwards, he was taken to the hospital by ambulance.

## DISCUSSION

### I. Sufficiency of the Evidence/Weight of the Evidence

¶26. In reviewing a challenge to the legal sufficiency of the evidence in a criminal trial, this Court considers whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Body v. State*, 318 So. 3d 1104, 1108 (Miss. 2021) (internal quotation marks omitted) (quoting *Parish v. State*, 176 So. 3d 781, 785 (Miss. 2015)). We view all of the evidence in the light most favorable to the prosecution, accept all the evidence supporting the verdict as true, and give the prosecution the benefit of all favorable inferences that reasonably can be drawn from the evidence. *Id.*

¶27. In reviewing a challenge to the weight of the evidence, this Court will not disturb the jury's verdict unless it appears to be "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Willis v. State*, 911 So. 2d 947, 950 (Miss. 2005) (citing *Stewart v. State*, 909 So. 2d 52, 57 (Miss. 2005)).

### A. Sufficiency of the Evidence

¶28. Redd claims that the evidence presented failed to establish beyond a reasonable doubt that Redd had the intent to cause bodily injury to Stevenson or Gaston. Because the jury found Redd not guilty of aggravated assault as to Gaston, Redd contends that it cannot be said that there was a "transfer of intent" from Gaston to Stevenson as the State had submitted during opening and closing arguments.

¶29. The State contends that sufficient evidence was presented to support the jury's guilty verdict as to aggravated assault of Stevenson alone. The State further contends that sufficient evidence of aggravated assault as to Gaston was presented despite the jury's decision not to convict on that count. The State argues that "when verdicts are inconsistent, the reviewing court properly considers whether evidence was sufficient to support only those counts on which a conviction is reached." *Jones v. State*, 95 So. 3d 641, 645 (Miss. 2012) (citing *Jones v. State*, 95 So. 3d 672, 679 (Miss. Ct. App. 2011)). Thus, according to the State, the theory of transferred intent still stands.

¶30. We do not find the jury's verdicts inconsistent. As the jury was instructed, a person is guilty of aggravated assault if he or she "attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]" Miss. Code Ann. § 97-3-7(2)(a)(ii) (Rev. 2020). There is no dispute that Stevenson was shot and injured by a deadly weapon. The only other element required in this case was whether Redd "purposely or knowingly cause[d]" it. The evidence presented demonstrates that this element was met. *Id.*

8

¶31.   Following his fight with Gaston, which according to Redd's own testimony included Stevenson, Redd announced that he was he was "fixing to kill you Mfers." Redd left the pool hall and returned with an "AK-47" type rifle.

¶32.   While evidence indicated that Redd was coming back for Gaston after Redd retrieved his gun, evidence also indicated that Redd was angry with Stevenson. When asked by the State if she knew any reason why Redd would want to shoot her in the leg, Stevenson said it was because of money that Redd had been saying she owed him. Stevenson also said that Redd had previously showed up at her house with a gun.

¶33.   Redd himself testified that when Gaston and Stevenson arrived at the pool hall on July 5, he decided to leave "because we had already had some bad conversations." Redd told the jury that he heard someone outside the pool hall tell Gaston and Stevenson that Redd was inside the building and that Gaston and Stevenson needed "to find another place to go since y'all have been having words." Redd said he heard Stevenson respond, "I don't care that he is in there. Just another sex deal gone bad." Redd said he reminded Stevenson about the $50 he had loaned her, "and [he] wasn't worried about it." He also told Stevenson that "it wasn't nice for her to keep telling people that when it wasn't true."

¶34.   In the video submitted at trial, Redd told Chief Caradine that he had loaned Stevenson $50 for a poker game. Redd said Stevenson was mad at him for trying to collect the money days earlier. Redd then said that this "has been going on ever since then."

¶35.   The evidence showed that Redd was angry at both Gaston and Stevenson, and he purportedly threatened both of them after the fight. While Redd claimed that the gun fired

9

because someone grabbed his arm, others testified that no one grabbed Redd until after the shot. One can reasonably infer from the evidence that Redd purposely fired his weapon at Stevenson.

¶36. Lastly, that the State argued the doctrine of transferred intent as one of its theories of the case and had the jury instructed on this doctrine as well is inconsequential.

¶37. When Redd retrieved his weapon, the altercation between him and Gaston, as well as Stevenson, had ended. Stevenson was not an uninvolved bystander. *Cf. Rogers v. State*, 994 So. 2d 792, 803 (Miss. Ct. App. 2008).[2] And Redd had purportedly threatened both Gaston and Stevenson after the altercation.

¶38. The jury was provided a thorough self-defense instruction, which concluded as follows: "If you find that the defendant, [Redd], acted in self-defense, then you shall find him not guilty." The jury also was given a stand-your-ground instruction consistent with Mississippi Code Section 97-3-15(4) (Rev. 2020). The jury rejected both scenarios.

¶39. The jury also rejected the suggestion that the shooting was the result of negligence. Defense counsel conceded to the jury during closing argument that Redd was likely guilty of simple assault with regard to Stevenson. And the jury was provided a jury instruction as to this lesser-included offense.

---

[2] In *Rogers*, two bystanders were shot during an altercation that occurred between the defendant and another man. *Rogers*, 994 So. 2d at 804. The defendant was charged, *inter alia*, with two counts of aggravated assault. *Id.* But because the evidence showed that the defendant was acting in self defense when he fired his weapon and struck the two bystanders, the Court of Appeals reversed and rendered both aggravated-assault convictions. *Id.*

¶40. Based on the evidence of the case, Redd's jury reasonably and legally could conclude that he was engaged in unlawful activity when he returned to the pool hall with his weapon after his altercation with Gaston and Stevenson. And the jury could reasonably infer from the evidence that Redd had malicious intent toward Stevenson independent of whatever intent Redd had towards Gaston.

¶41. Viewing the evidence in a light most favorable to the jury's verdict, the State presented sufficient evidence to support Redd's conviction for aggravated assault of Stevenson.

### B. Weight of the Evidence

¶42. Redd reiterates his claim that because "there was no intent found for aggravated assault against [Gaston] by the jury then there can be no transferred intent as to [Stevenson]." Redd further contends that Stevenson's testimony creates uncertainty and demonstrates that she was not a credible witness. Redd points to the following inconsistencies: Stevenson admitted that the pool hall was peaceful until her crew arrived. On direct examination, Stevenson said that Redd threw the first punch against Gaston, but on cross-examination, she admitted that she did not know who threw the first punch. Stevenson initially testified that she and her nephew Gaston had never had a physical altercation between each other, but Stevenson later indicated that was not true, stating "well it wasn't - - we family though."

¶43. Lastly, Redd argues that Stevenson had testified that Redd shot her with a high-power long rifle at an extremely close range. But according to Redd, if he had shot Stevenson "at that close of a range with a high-power rifle [with] the intent to seriously cause bodily harm

11

to [Stevenson,] her injuries . . . would have been quite more severe." Also, Redd submits that Gaston had testified that the parties were in too close proximity for Redd to raise the gun.

¶44. Accordingly, Redd submits that to allow the jury verdict to stand on the first count, "when the State failed to meet its burden of proof for the charge of aggravated assault [on the second count], specifically as to intent, has resulted in an unconscionable injustice to [Redd]."

¶45. For reasons just explained, the jury could reasonably infer from the evidence that Redd had malicious intent toward Stevenson—independent or irrespective of whatever intent Redd may have had toward Gaston. Further, just because the jury found Redd not guilty of aggravated assault as to Gaston does not mean that the State failed to meet its burden as to that charge.

¶46. The State presented sufficient evidence to uphold Redd's aggravated-assault conviction as to Stevenson. And the evidence does not preponderate heavily against the jury's verdict.

¶47. Any inconsistencies in Stevenson's testimony were for the jury to reconcile as the triers of facts and sole judges of her credibility in this case. *Keithley v. State*, 111 So. 3d 1202, 1205 (Miss. 2013) (citing *Blanchard v. State*, 55 So. 3d 1074, 1079 (Miss. 2011)). Who actually started the initial confrontation at the pool hall entrance between the parties, and whether or not Stevenson and her nephew Gaston had between themselves been involved in any prior physical altercations amongst were insignificant and trivial matters overall.

¶48. As to Redd's contention about his proximity to Stevenson when she was shot, defense counsel repeatedly sought to elicit testimony from Stevenson and Gaston on cross-examination that Redd had the weapon pointed downward when it fired. Gaston, however, testified that the gun "wasn't point[ed] to the floor." Gaston described that Redd was "about to raise it and [Stevenson] was right there and [Redd] pulled the trigger." Gaston said that Redd's proximity to Stevenson, "about 8 to 10 inches," was such that "it made it almost impossible for [the gun] to be pointed all the way up." Gaston said "that is how [Stevenson] ended up being shot in her leg." Gaston maintained throughout his testimony that Redd did not have the weapon in a "completely downward trajectory."

¶49. Redd's proximity to Stevenson and where or how the gun was pointed when it was fired were factual questions for the jury's determination. That Redd's gun was not positioned for a kill shot does not negate a finding of aggravated assault under the evidence of this case.

¶50. Again, to prove aggravated assault under Section 97-3-7(4)(a)(ii), the State must demonstrate that the defendant "purposely or knowingly cause[d] bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily injury." "'Purposely or knowingly' has substantially the same meaning as 'wilfully,' which itself "means intentionally and not by accident.'" *Greenleaf v. State*, 267 So. 3d 749, 752-53 (Miss. 2019) (quoting *State v. Hawkins*, 145 So. 3d 636, 641 (Miss. 2014)).

¶51. As mentioned, there was no dispute that Stevenson was injured by a deadly weapon. And while Section 97-3-7(4)(a)(ii) does not require serious bodily injury to result, the photos

13

submitted at trial undoubtedly show—contrary to Redd's assertion on appeal—that Stevenson was in fact seriously injured.

¶52. We find that Redd's challenge to the weight of the evidence is without merit.

## II. Trial Court's Failure to Rule on Certain Objections by the Defense

### A. Stevenson Testimony

¶53. Redd contends that the trial court erroneously failed to rule on an objection made by the defense during Stevenson's testimony on the basis that it called for speculation by the witness. Redd points to the following colloquy during the State's direct examination of Stevenson:

> Q.     After you said that [Redd] shot you[;] you were able to call . . . "Quidell" but Lawrence Caradine, now the chief?
>
> A.     Yes. And Antwayn Patterson. He, I guess, he had followed [Redd] in behind. He said he had followed [Redd] down the little walkway to the door to, you know, come in. And he grabbed the clip out of the gun. He grabbed the clip out of the gun and my nephew had rushed him from the other side and they tackled him, you know, tackled him down to get him, keep him from shooting, because he was fixing to really open fire again. He was going to kill somebody.
>
> BY MR. HARLOW:     Objection to speculation.
>
> BY MR. HOWARD:
>
> Q.     Okay. So you are saying after [Redd] shot you in the leg that's when your nephew and someone by the name of Antwayn Patterson approached [Redd].
>
> A.     Yes. He grabbed that clip out of the gun.

14

¶54. Redd contends that Stevenson's statement, "he was fixing to really open fire again. He was going to kill somebody[,]" caused irreparable harm to Redd that undoubtedly affected the jury's verdict.

¶55. The State contends that Redd waived this objection because he did not obtain a ruling from trial court. *Walters v. State*, 720 So. 2d 856, 864 (Miss. 1998) (failure to obtain a definitive ruling or corrective action from the trial court following an objection constitutes waiver of the objection (citing *Gayten v. State*, 595 So. 2d 409, 413 (Miss. 1992))).

¶56. We agree with the State. As the record shows, Redd failed to seek a definitive ruling or request corrective action from the trial court following his objection. Thus, the matter is barred from review on appeal. Redd also fails to explain on appeal why Stevenson's statements constitute improper speculative testimony and fails to cite any relevant authority for support. Procedural bars notwithstanding, error, if any, was harmless in this case.

¶57. Although some jurisdictions have taken a different view, this Court has held that it is improper to allow "comment on the subjective intentions of an accused by a witness based on conclusions reached from his observation [because it] invades the province of the fact finders." *Morris v. State*, 748 So. 2d 143, 144 (Miss. 1999) (quoting *Garrison v. State*, 726 So. 2d 1144, 1150-51 (Miss. 1998)). The *Morris* Court found that the trial court erred by allowing, over the defendant's objection, two sheriff deputies to offer their opinion that the defendant had intended to run the two deputies off of the road. *Id.* at 147. The *Morris* Court, however, did not reverse on this error. Because the indictment and jury instructions

15

incorrectly listed the elements of the charge, the *Morris* Court found that the defendant was denied due process, "requiring reversal in this case." *Id.*

¶58.    Here, unlike in *Morris*, the State did not ask Stevenson to opine on Redd's subjective intent. *Id.* Also, when Stevenson made her comments, she had already testified that Redd had stated he was "fixing to kill you Mfers." Thus, Redd had purportedly expressed his intent. *Shanklin v. State*, 290 So. 2d 625, 627 (Miss. 1974) ("The intent to commit a crime or to do an act by a free agent can be determined only by the act itself, surrounding circumstances, and *expressions made by the actor with reference to his intent*." (emphasis added *Thompson v. State*, 258 So. 2d 448 (Miss. 1972)). And according to Gaston, after Redd shot Stevenson, Redd kept saying, "I am about to kill him." Thus, Redd again purportedly expressed his intent. Neither comments seriously affected the fairness of Redd's trial.

### B.    Facts Not in Evidence During Closing Arguments

¶59.    Redd contends that during closing arguments the State said that "[Redd] left, went to his car to get a gun, threatened people. His own brother is trying to stop him. His own brother trying to - -" Redd objected at that point, claiming that the State was arguing facts not in evidence. The State continued, saying:

> can I just finish? I am not going to say what she said. She said that he said, "get out of my way" to his brother. So that would  show - - a reasonable jury could infer by him saying, "get out of my way" that he would be saying that for because my brother is trying to stop him.

¶60.    Citing *Walters*, 720 So. 2d at 864, the State contends that this objection too is waived because Redd again failed to obtain a definitive ruling from the trial court.

16

¶61. The State is correct that Redd failed to obtain a definitive ruling from the trial court. Thus, the matter is barred from review on appeal. Procedural bar notwithstanding, however, we find no merit to Redd's assertion.

¶62. Alaysia Embry testified for the State that she was standing outside the pool hall prior to the shooting. She "heard a lot of commotion." She then saw Redd come outside and walk to the trunk of his car. Embry saw Redd's brother there and saw him "move[] out of the way" when Redd "started walking back into the building." Embry said she saw Redd holding a gun after he went to the trunk of his car. When asked by State if she heard Redd say anything to his brother, Embry replied that Redd said, "Get out of my way."

¶63. The trial court allowed this testimony from Embry following a proffer from the State outside the presence of the jury. Defense counsel told the trial court after the proffer that he did not have a problem with Embry's purported testimony as long as she did not say anything as to what Redd's brother said to Redd. The trial court agreed with the defense and instructed that Embry could testify to what she had observed.

¶64. "[T]he prosecution is permitted to draw inferences from the evidence in closing arguments." *Moffett v. State*, 156 So. 3d 835, 869 (Miss. 2014). That Redd purportedly said to his brother outside the pool hall, "Get out of my way," was a fact in evidence—constituting a nonhearsay statement under Rule 801(d)(2)(A) of the Mississippi Rules of Evidence.

17

¶65. Given Redd's statement to his brother outside the pool hall coupled with the rest of Ambry's testimony as to what she had observed, the State's comment that Redd's "brother was trying to stop him" was a fair inference from the evidence.

¶66. This contention of error is without merit.

### III. Whether Redd was prejudiced because the jury venire failed to provide an adequate number of potential members of his race.

¶67. Redd claims that his right to a fair trial under the Sixth Amendment to United States Constitution was violated because "[t]he jury pool was non-representative of the racial composition of the community from which the prospective jurors were summoned." He contends that "the jury empaneled consisted of only one African-American female, [while] the remaining members were Caucasian."

¶68. "[A] defendant has no right to a petit jury composed in whole or in part of persons of his own race." *Batiste v. State*, 121 So. 3d 808, 849 (Miss. 2013) (internal quotation marks omitted) (quoting *Pitchford v. State*, 45 So. 3d 216, 228 (Miss. 2010)). The Sixth Amendment does, however, require that a jury for criminal trials be drawn from a source representing a "fair cross section" of the community in which the defendant is tried. *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S. Ct. 692, 700-01, 42 L. Ed. 2d 690 (1975). To establish violation of the fair cross-section requirement, a defendant must demonstrate:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury selection process.

18

*Lanier v. State*, 533 So. 2d 473, 477 (Miss. 1988) (emphasis omitted) (quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 668, 58 L. Ed. 2d 579 (1979)).

¶69.   Here, Redd did not object to the racial composition of the venire in the trial court, and the record is silent concerning its composition.  Accordingly, the issue is both procedurally barred and without merit.  *Manning v. State*, 735 So. 2d 323, 346 (Miss. 1999).

## CONCLUSION

¶70.   Redd's conviction and sentence for aggravated assault are affirmed.

¶71.   **AFFIRMED.**

   **RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**